Submitted on briefs May 21, affirmed October 8, 1952

# ELWERT *v.* ELWERT

248 P. 2d 847

*S. J. Bischoff* and *George W. Mead,* of Portland, for appellant.

*W. J. Prendergast, Jr.,* and *Leo Levenson,* of Portland, for respondent.

WARNER, J.

Leo Elwert, the defendant-appellant, and Mary Elwert, the plaintiff-respondent, were married in Portland, Oregon, on November 10, 1926. The defendant had been born and raised in Washington county, Oregon, and at the time of his marriage was 24 years old. From the time he was 14, he had been actively and continuously engaged in the nursery business near Sherwood, Oregon. Mary Elwert was about 22 years of age when she married her husband. She, too, had lived in Washington county since 1920. The parties

had known each other for approximately 6 years prior to 1926. Their families were neighbors with homes separated only by a roadway. Two daughters were born of this union. The older girl was about 23 years of age at the time of trial, married and in attendance at one of the state colleges. The younger child in 1951 was about 16. She lived with her mother and was a senior in a nearby high school.

When the parties were married, the defendant was already modestly established as a nurseryman on his father's farm near Sherwood. After their marriage the business, now known as Tualatin Valley Nurseries, was operated as a partnership enterprise by Mr. and Mrs. Elwert. With little or nothing to start with and by dint of their hard labor, they eventually made their nursery a sizeable institution in terms of assets and profits. The nursery supplied, largely through mail orders, an extensive clientele throughout the West, including customers from such distant places as Mexico.

There is a sharp division between the parties as to exactly when they ceased to regard each other in terms of matrimonial respect and affection. The defendant contends that a cooling of interest was evident 7 or 8 years before his departure for Idaho. On the other hand, the plaintiff asserts there was no manifestation of a serious cleavage until his life became enmeshed with the woman to whom we hereinafter refer. We are disposed to give greater weight to Mrs. Elwert's version on this point.

We are unable to discover the exact date, but it appears that some time before January 1, 1946, there arose in the offing a cloud which first overshadowed and later more greatly blighted the domestic life of

plaintiff and defendant. It was then that the defendant first met the woman whom we shall call Greta.

Greta, when she met the defendant, was the wife of another to whom she had been married for more than 11 years. At the time of her first acquaintance with the defendant, her husband was in the United States navy and away from home. The subsisting affair between the defendant and Greta was such that Elwert, unknown to his wife, bought a motel located on one of the state highways not far from his home in Sherwood, and there he established his favorite as manager. This relationship eventually incited Greta's husband to bring an action against Elwert in December, 1946, wherein he alleged alienation of his wife's affections, for which he claimed substantial damages. That case was settled and dismissed in March of the following year upon Elwert's payment of the sum of about $9,000 to Greta's spouse. The alienation suit was followed by a divorce separating Greta and her husband.

Notwithstanding these things, the irregular liaison between the defendant and Greta seemed to continue and blossom with time, in ways indicating an increasingly emboldened and reckless disregard for social amenities and the law. In July, 1948, they flew to the Hawaiian Islands, where for a week they disported themselves as husband and wife.

The Hawaiian trip had an interesting aftermath. For many years prior to 1949, Tualatin Valley Nurseries had annually circulated among its many customers a lithographed edition of wall calendars of goodly size. Before 1949, it had been Elwert's custom to decorate these calendars with various pictures of his two attractive daughters, giving their names and picturing them against a background appropriate to the nursery industry. This custom, however, was

abandoned in 1948, after defendant's return from the Pacific. Then he substituted a picture of Greta taken shortly before on their visit to Hawaii. Her picture was photographed against a background of palm trees and printed in color. It was entitled on the nursery's 1949 calendar as "My Girl" and was thereafter given wide distribution by Elwert to the nursery trade.

Sometime in September, 1948, according to Mrs. Elwert, the defendant approached her and asked for a divorce, saying "he had found someone that he loved." She represents that she was shocked by this news and promptly repudiated his suggestion.

These events evidently contributed to his precipitous departure by airplane for Boise, Idaho, about October 18, 1948, without telling his wife or anyone else where he was going. He claims he went there to establish a permanent residence and a new business, although it was the first time he had ever been in that city.

■ On December 18, 1948, the defendant filed a suit in that state for divorce. Mrs. Elwert was subsequently personally served in Oregon with summons in the Idaho case but entered no appearance. An ex parte hearing on the divorce was begun in Gooding, Idaho, on June 11, 1949, but adjourned after the taking of evidence until June 18, 1949. The reason for the adjournment was the court's uncertainty about the sufficiency of evidence on the subject of domicil. After the final hearing on June 18, the court on June 24 granted Leo a decree. This decree carries this significant recital:

"This cause coming on to be heard on June 11, 1949, * * * and the Court having stated that it was not entirely satisfied on the proof submitted on residence of the plaintiff as required by law, and the plaintiff thereupon having moved the Court for

an Order of Continuance to submit additional proof of residence of plaintiff as required by law * * * .''

''Residence'', as used in the divorce code of Idaho (§ 32-71, Idaho Code), means ''domicil''. *Reubelmann v. Reubelmann,* 38 Idaho 159, 220 P 404. A duly certified copy of the judgment roll and transcript of the testimony in the Idaho suit was made an exhibit in this. case.

Although the defendant and Greta went through the ceremony of marriage at Idaho City, Idaho, on July 22, 1949, Elwert refrained from telling about his marriage for some time afterward. Prior to their marriage, Greta had gone to Idaho on several occasions. Some time in the month of August following, they abandoned Idaho as the situs of their claimed residence and likewise the Idaho ''business'' which Elwert says he had established in that state. They returned to Oregon and took up residence near Maplewood, not far from Tualatin Valley Nurseries in which Elwert had actively continued his management, and there began the construction of a substantial residence in which they now live.

Mary Elwert did not learn of the divorce until August. She filed her complaint in this suit in October, 1949, wherein she sought a decree of separation of the plaintiff and defendant from bed and board for an unlimited period of time and for a declaration that the decree in the Idaho case was null and void. Her claim for a separation decree rests upon allegations of cruel and inhuman treatment springing primarily from defendant's relations with Greta. She also asserts that defendant's allegations of domicil in Idaho in that case were false.

The defendant by his answer joined issue on the

material allegations of plaintiff's complaint and pleaded the verity of the Idaho decree in defense. From a decree in favor of Mary Elwert, the defendant Leo Elwert appeals.

Taken by its four corners, the voluminous record before us presents a sad and sordid tale of meretricious intrigue and brazen philandering, perjury and legal deception. It is a recital of bold defiance of primal social conventions and the laws designed to secure family happiness and continued marital solidarity. It is a story which leaves in its wake heartache and humiliation for the innocent and reflects a needless depreciation in the worth of an enterprise built by long years of thrift, sacrifice and hard labor on the part of the plaintiff and the defendant and their one-time harmonious cooperation of more than 22 years.

No issue is here made concerning the sufficiency of the evidence to support a decree of separation if the challenged Idaho decree is not void; and, therefore, our only problem is to determine the validity of that decree.

■ It is essential to the validity of a divorce decree that at least one of the parties have a domicil in the state which granted the decree. *Kelley v. Kelley,* 183 Or 169, 183, 191 P2d 656, and cases there cited.

■ The courts of this state, however, are not precluded by the Full Faith and Credit Clause of the constitution of the United States (Art. IV, § 1) from impeaching the decree of another state, when they are satisfied that the prevailing party has not established a domicil therein and the record reveals, as here, that the other spouse neither appeared in the suit nor has been served with process within the boundaries of the state granting the divorce. *Kelley v. Kelley,* supra, at 183; *Zimmerman v. Zimmerman,* 175 Or 585, 591, 155 P2d 293; *Kiessenbeck v. Kiessenbeck,* 145 Or 82, 85, 26 P2d

58; *Williams v. North Carolina* (II), 325 US 226, 230, 89 L ed 1577, 65 S Ct 1092; 3 Nelson, Divorce and Annulment 2d ed, 573, 583, §§ 33.68, 33.72.

■ When there is evidence that the prevailing spouse obtained the challenged decree by resorting to deception practiced in the court where the divorce was granted and his perfidy was in the nature of " 'fraudulent representations, designed and intended to mislead, with knowledge of falsity, and resulting in damaging deception' ''', we have no hesitancy in holding that the decree has no extraterritorial effect in this state. *Rodda v. Rodda,* 185 Or 140, 161, 200 P2d 616, 202 P2d 638 (certiorari denied 337 US 946, 93 L ed 1749, 69 S Ct 1504); *Stimson v. Stimson et al.,* 140 Or 507, 515, 13 P2d 368; 27 CJS, Divorce, 1303, § 336.

5. The finding of the Idaho court on the fact of domicil is "entitled to respect, and more", and the burden of undermining the verity imported by the decree of that state rests heavily upon the assailant, in this instance, the plaintiff wife. *Williams v. North Carolina,* supra, 325 US 233. We have held that such a finding is of prima facie weight but not conclusive and may be relitigated here. *Rodda v. Rodda,* supra, at 145, and cases there cited; *Tilt v. Kelsey,* 207 US 43, 51, 52 L ed 95, 28 S Ct 1; 17 Am Jur, Domicil, 646, § 97.

No single word in the legal vocabulary is more difficult than "domicil" to define accurately. Some writers have declared that no exact definition can be given to the word or any formula laid down which, when applied to the facts of a particular case, will render it possible to say at once where the domicil may be. *Reed's Will,* 48 Or 500, 503, 87 P 763, 9 LRA NS 1159.

In *Reed's Will,* supra, at 504, this court said:

" 'Domicile,' strictly speaking, is the relation the law creates between an individual and a partic-

ular place or country, and each case is dependent upon its own particular facts. It is not in a legal sense synonymous with 'residence.' * * * To constitute domicile there must be both the fact of a fixed habitation or abode in a particular place, and an intention to remain there permanently or indefinitely; or, as Mr. Wharton says: 'There must be: (1) residence, actual or inchoate; (2) the nonexistence of any intention to make a domicile elsewhere:' Wharton Conflict of Laws, § 21. Domicile, therefore, is made up of residence and intention. Neither, standing alone, is sufficient for the purpose. Residence is not enough, except as it is conjoined with intent, which determines whether its character is permanent or temporary; and clearly a mere intent cannot create a domicile * * *.''

■ The dominant factor in the change of domicil is intention. To constitute a change three things are essential: (1) residence in another place, (2) an intention to abandon the old domicil, and (3) an intention to acquire a new domicil. *Kelley v. Kelley,* supra, at 184; *In re Noyes' Estate,* 182 Or 1, 14, 185 P2d 555; *Reed's Will,* supra, at 508. The fact of intention is one that involves special difficulties in proof. 17 Am Jur, Domicil, 640, § 86.

A person does not acquire a new domicil by merely going to another place with the intention of making it his domicil. More is required in the eyes of the law. Such intention must be supported with an intention (1) of residing in the new place for a more or less indefinite time and (2) of making the new place his home within the meaning of ''home'' as that term is used in the law of domicil. 17 Am Jur, Domicil, 604, § 23. In Restatement, Conflict of Laws, 39, § 20, we find: ''For the acquisition of a domicil of choice the intention to make a home must be an intention to make a home at the moment, not to make a home in

the future.'' It must be an intention to make a home in fact, not merely an intention to acquire a domicil. Restatement, Conflict of Laws, 38, § 19. In short, a party's declaration that he was abandoning Oregon as his home state, and perhaps with the added statement that he was going to Idaho, does not ipso facto establish a termination of his Oregon domicil and mark the beginning of his Idaho domicil. The new domicil of choice does not come into being until the moment when his intention with reference thereto was characterized by a further intent to reside in that state for an indefinite length of time and make it his "home". When and only when such intention became a real and fixed determination could the defendant legally establish the beginning of his six-weeks' period of residence or domicil necessary to give the courts of Idaho jurisdiction of the divorce suit filed there. For an authoritative exposition of the common law requirements of domicil, see *Zimmerman v. Zimmerman,* supra, 175 Or 591.

Domicil, in legal contemplation, depends not alone on residence but also upon a consideration of all the circumstances of the case. 17 Am Jur, Domicil, 639, § 82. In *Reed's Will,* supra, 48 Or 506, Mr. Justice ROBERT BEAN quotes with approval Vice Chancellor Kindersley's statement in *Drevon v. Drevon,* 34 LJ NS Eq 129:

> " '* * * I think, with regard to that point, the true conclusion is this, not that any one act or any one circumstance is necessarily *per se* of vast importance and other circumstances of little importance, but it is a question what is the relative importance of the different acts, whether some acts tending one way are of greater weight than those tending the other as to the *animus manendi* or the *animus revertendi,* or the animus as to changing domicile.' * * *.''

We again turn to 17 Am Jur, Domicil, 642, § 90, and read:

> "* * * It has been said that the determination of domicil depends upon no one fact or combination of circumstances, but upon the whole, taken together. From this point of view it is manifest that *very slight circumstances* must often decide the question. The determination depends upon the preponderance of evidence in favor of some particular place as the domicil. The conduct and the various acts of the party are not ordinarily conclusive of the question, but are regarded rather as circumstances from which the jury in its discretion may find the fact * * *." (Italics ours.)

*Reed's Will,* supra, at 510, is to the same tenor:

> "* * * This intention, it is true, may be inferred from circumstances, and the residence may be of such a character and accompanied by such indices of a permanent home that the law will apply to the facts a result contrary to the actual intention of the party * * *."

Professor J. H. Beale of the Harvard Law School, in his learned and frequently cited article entitled "Proof of Domicil" appearing in 74 Penn L Rev 552 et seq., has observed, at 560: "Since actions speak louder than words the conduct of a person is the most important evidence of his intention to acquire a domicil in a place * * *." After quoting the foregoing from Professor Beale, 17 Am Jur, Domicil, 643, § 92, adds: "* * * Where, therefore, the declarations of a party as to his intent are inconsistent with his acts, his conduct is of greater evidential value than his declarations * * *." (Supported by note 6.) Also see *Reed's Will,* supra, at 516; Jacobs, Law of Domicil, 556, § 455; Kennan, Residence and Domicile, 202, § 95.

Kennan, Residence and Domicile, 211, 212, §§ 101, 102, states:

"The intention to remain in a new location for an unlimited period is perhaps the most important element in any change of domicile and at the same time the most difficult of determination. No two cases are exactly alike and each 'involves fundamentally the problems of an accurate analysis of that complex aggregate of fact and intention, i.e., physical facts and mental facts, which go to make up the legal concept of domicile' * * *.

"* * * the great weight of authority is insistent upon the necessity of clear and convincing proof of the animus manendi * * *."

We do not intend to marshal here all the criteria available in the analysis of the evidence in resolving important and difficult questions of intention to establish a domicil. We here content ourselves with referring to some recognized factors, particularly as they have a bearing on the record before us.

 The nature and location of a party's business with reference to his residence is an element for consideration. In general, it is held that merely being engaged in business, even on a large scale, in a state or municipality other than that in which one's family resides does not justify the claim of legal residence at the business location. Kennan, Residence and Domicile, 104, § 49. The retention of an interest in a business in the locality from which one has removed weakens the proof of abandonment and requires some explanation. Kennan, Residence and Domicile, 220, 107. Evidence that the *main* place of a man's business is at the place from which he came may be indicative of an intention to maintain his domicil in that locality. 17 Am Jur, Domicil, 646, § 95. If he has two residences, his domicil will be presumed to be the one which appears to be the

center of his affairs. *Reed's Will,* supra; 17 Am Jur, Domicil, 639, § 85. Therefore, one who has resided and carried on business for years in one jurisdiction cannot for his own purposes insist that his domicil is in another. The facts may belie the expressed intent to retain a domicil actually given up. 17 Am Jur, Domicil, 643, § 92. The original domicil is favored and where the facts are conflicting, the presumption is strongly in favor of an original or former domicil as against an acquired one. 28 CJS, Domicile, 36, § 16.

Failure to perform the duties and avail oneself of the privilege of a citizen in the community of one's new residence constitutes significant facts pointing to no change in domicil. Among these is the failure to pay taxes in the place where he claims domicil. *Mooar v. Harvey,* 128 Mass 219; Kennan, Residence and Domicile, 219, § 105; 74 Penn L Rev 552, 569. We submit that when the state law mandates that residents of a given state pay income taxes on income earned within that state or when federal laws or regulations direct that federal income tax returns be filed with the collector of internal revenue nearest the place of the taxpayer's residence and the taxpayer pays his state income taxes in the state of his first residence and makes no state return in the state in which he claims new domicil and sends his federal returns to the federal collector nearest his first home, such activity on his part creates a strong presumption that his domicil continues in the state in which he makes such returns.

Another evidence of failure to perform the duties of a citizen in the community where a new domicil is asserted is the neglect of the claimant, wilful or otherwise, to secure such licenses as are ordinarily required of residents by the state of his new "home". Among these are automobile licenses, licenses to operate motor ve-

hicles and licenses or permits to carry on the kind of business in which he claims to have been engaged.

The question of the party's motive in changing domicil may be immaterial to the court of the state in which the divorce decree was granted, but it is clearly a factor which can be considered when the validity of the decree comes into question elsewhere and is challenged on the issue of intent. *Williamson v. Osenton,* 232 US 619, 625, 58 L ed 758, 34 S Ct 442; 17 Am Jur, Domicil, 606, § 26; Restatement, Conflict of Laws, 39, § 20; Kennan, Residence and Domicile, 458, § 245; 2 Nelson, Divorce and Annulment 2d ed, 646, § 21.17.

In determining whether the defendant Elwert in fact intended to abandon his Oregon domicil and acquire a new one in Idaho, we can bear in mind his situation at the time of his removal, the causes which prompted it, its purpose and the place to which he removed. We can also give weight to the character of his investments in Idaho, if any, and the disposition made of his business affairs in Oregon. *Reed's Will,* supra, 48 Or 511.

By way of a summary of various matters challenging inquiry in a judicial quest for facts upon which to predicate a determination of domicil, we quote from Mr. Justice Jackson's statement in *District of Columbia v. Murphy,* 314 US 441, 457, 86 L ed 329, 62 S Ct 303:

"Of course the manner of living here, taken in connection with one's station in life, is relevant. Did he hire a furnished room or establish himself by the purchase of a house? Or did he rent a house or apartment? Has he brought his family and dependents here? Has he brought his goods? What relations has he to churches, clubs, lodges, and investments that identify him with the District?

"All facts which go to show the relations re-

tained to one's former place of abode are relevant in determining domicile. What bridges have been kept and what have been burned? Does he retain a place of abode there, or is there a family home with which he retains identity? Does he have investments in local property or enterprise which attach him to the community? What are his affiliations with the professional, religious, and fraternal life of the community, and what other associations does he cling to? How permanent was his domicile in the community from which he came? Had it long been a family seat, or was he there a bird of passage? Would a return to the old community pick up threads of close association? Or has he so severed his relations that his old community is as strange as another? Did he pay taxes in the old community because of his retention of domicile which he could have avoided by giving it up? Were they nominal or substantial? * * *."

■ Self-serving declarations of the party securing the controverted decree have but little weight in a suit of this kind. "Declarations which tend to establish a domicile which is advantageous to the declarant are viewed with suspicion and if admitted at all are accorded but little weight * * *." Kennan, Residence and Domicile, 90, § 39. Also see Jacobs, Law of Domicil, 555, § 455. This is particularly true when the declarations of intention are made in view of a possibly contested domicil. 74 Penn L Rev 552, 555. Declarations of domicil may be met with evidence of contradictory acts and conduct happening after as well as before the date in question, if they throw light on the matter of intent and are reasonably contemporaneous to that date. *Loeser et al. v. Jorgensen et al.,* 137 Mich 220, 100 NW 450, 451; 28 CJS, Domicile, 40, § 17(d).

With the foregoing in mind, we now turn our attention to an examination of pertinent facts bearing on

the subject of defendant's Idaho domicil and hereinafter collated under headlines suggesting some of the criteria of domicil in terms of the rules above discussed. These facts, in addition to those previously indicated, are:

## The Oregon Business

The record relating to the Oregon business of the defendant (Tualatin Valley Nurseries of Sherwood, Oregon), claimed by Elwert to have been abandoned when he left for Idaho, is, indeed, a revealing one and under the permissible criteria of domicil weighs heavily in our conclusions. It assumes added persuasiveness when viewed in the light of and in contrast to his Idaho "business" hereinafter discussed.

At the time Elwert left for Idaho, he had put more than 32 years of hard labor and experience into the Sherwood business. It had grown to a point where, to use defendant's own words, he was in 1948 growing "more than a half million fruit trees each year, besides importing and growing several million bulbs, plants and vines annually * * *." A large part of its business was on a mail-order basis with an operating field far beyond the boundaries of Oregon. Elwert was the manager. Mrs. Elwert worked in the office, typed letters and orders, received and opened the mail and attended to all banking. They employed not fewer than 20 persons at all times and at certain seasons as many as 50 to 60.

Their major assets consisted of 15 separate parcels of real property and 6 other parcels upon which they paid taxes. They were the owners of 8 motor vehicles: trucks, pickups, a jeep and a Chrysler sedan, besides the Lincoln which Mr. Elwert had with him in Idaho. Their properties were unencumbered and upon inquiry

from the court, Elwert advised they were worth from $150,000 to $200,000. He later corrected this to $125,000 as a more "conservative" figure.

The operation grossed $200,000 in 1946 and more than that amount in 1947. According to Elwert, they paid income taxes in 1947 of "[$]50,000 or [$]40,000". The income in 1948, although less than the years of 1946 and 1947, netted a profit of $27,000 before taxes.

With vague and evasive testimony, Elwert would have us believe that he spent but little time in Oregon during the vital jurisdictional period in Idaho, that is, between the date of his arrival there on October 18, 1948, and the date of the filing of his divorce complaint on December 18, 1948. The record disputes him beyond a shadow of a doubt. We find that nearly every week end during that time, he was at the nursery making out weekly payroll checks for the employees. We are also persuaded by the record that on such occasions he remained in Sherwood from 4 to 5 days at a time. On this basis it can be shown that the greater part of his first two-months' residence in Idaho was spent in Oregon in the furtherance of his business here. Elwert told the Idaho court he remained in Oregon only from "two to three days" on each of his trips back to this state. Moreover, while in Oregon he addressed himself to usual matters of management, including the obtaining of trees to fill orders taken by him in Idaho. On one occasion he dug up 800 trees for that purpose.

### The Idaho Business

Elwert's so-called Idaho "business" was operated with his rooming house as a base and consisted primarily of soliciting orders by personal calls upon former customers of Tualatin Valley Nurseries living in Idaho and Utah, and possibly some others. He used

the partnership-owned Lincoln in his travels and sometimes a partnership pickup for making his deliveries.

He took no nursery stock or supplies with him when he went to Idaho. At no time did he maintain a lot or yard in Idaho where such stock could be stored or exhibited prior to sale. Orders were taken on the order blanks of Tualatin Valley Nurseries, and some of the orders were thereafter filled directly by the Sherwood plant and others filled by Elwert after picking up stock at his plant in Oregon for delivery directly to customers solicited in Idaho. He claims to have filled some orders for nursery stock not then available at his Sherwood plant from stock which he purchased directly from other nurserymen in Washington and Oregon. Many of his customers solicited while he was in Idaho paid their accounts through the Sherwood office. Others paid him. His Oregon tax accountant, called as a witness for the defendant and who was also the auditor for the Tualatin nursery and in the latter capacity examined the books at the plant each month, did not know that Elwert claimed to have a separate business in Idaho. He stated that no separate record of the Idaho business was kept. At no time was Elwert licensed under the laws of Idaho to do business as a nurseryman in that state.

So far as the record discloses, Elwert did not make a visible capital investment in the state of Idaho in the interest of his alleged separate business there, except in the sum of $20 under what we deem unusual circumstances and damaging to his pretentions of good faith.

We have already referred to the recess taken in the trial of the Idaho case in order to supply evidence which might overcome the court's indicated doubt concerning the sufficiency of the proof on the allegation of domicil.

During the week which intervened between the first and final hearings in the Idaho suit, Elwert attempted to place himself in a position to represent to the court there, as he thereafter did, that he had acquired a parcel of real property in Idaho upon which to store and exhibit nursery stock. The deal he relied upon for that deception he accomplished by making a $20 earnest money payment on the purchase price of $250 for a vacant town lot situated on the outskirts of the city of Boise. After the divorce decree was granted, he forfeited the down payment, alleging an imperfect title as the reason therefor. At no time was the lot used in any manner in the furtherance of nursery sales.

We are of the opinion that Elwert did not establish a separate business in Idaho or even an activity that had the surface appearance of a separate business. This conclusion finds further support in what is hereinafter said under the headline of Taxes and Licenses.

We think it is not without significance that the defendant chose one of the least active seasons in the nursery business as the moment to establish his short period of jurisdictional domicil in Idaho. The testimony is that March and April are the peak and busiest months for Tualatin Valley Nurseries.

### Residences

The home place of the defendant in which he resided with his family prior to his departure for Idaho was adjacent to the office from which his nursery operations were directed. It is a two-story house of 8 rooms or more and, as shown by the picture in evidence, is a substantial and attractive structure surrounded by abundant hedges, shrubs and other flora. It was started during the depression years when costs were low and finished and occupied in 1940. The defendant

estimated its worth at $20,000. Its exterior appearance suggests a far greater value.

Perhaps more important is the fact that his Oregon home was set in a community where he has spent all the years of his life. A relatively short distance down the road from his house was the farm place and home of his aged and ill father, for whom he had manifested great solicitude. Across the road from his father's place was the home of his only brother, with whom he was on most amicable terms. Because of Elwert's long and uninterrupted residence in that countryside setting, it is reasonable to assume that nearby were many families and neighbors known to him from childhood days. This, he asserts, he left behind to make a new and permanent home in a strange locale where he had never been before he stepped from the airplane in Boise in August, 1948.

His own self-serving declarations of an intention to establish an indefinite domicil in Idaho are at best so hazy, vague and imperfect in substance that they do not meet four-square the three essentials of domicil laid down in *Reed's Will,* supra, 48 Or 504, and by their nature are so weak as to conjure a great suspicion as to his veracity. See Kennan, Residence and Domicile, 90, § 39; Jacobs, Law of Domicil, 555, § 455. This distrust is increased when we contrast his home in Oregon with the establishment he called home in Idaho.

In Boise he established his residence in a cheap rooming house which was, as he testified in the Idaho case, "as cheap as I could get." He took his meals elsewhere. Evidently it was too cheap for Greta because he abandoned the place at the time of his Idaho marriage to her. It was a residential situation out of line with his customary standards of living, his station in life and substantial financial worth. *District of*

*Columbia v. Murphy,* supra, 314 US 441. It did not comport with the manner of living of one who only three months before was able to afford a prenuptial honeymoon in the Hawaiian Islands or who made flying trips to Mexico to consort there with officials of that government concerning potential business matters of substantial magnitude.

### Taxes and Licenses

The defendant took with him to Idaho little or no property which might be the subject of ad valorem taxes in that state. He acquired none after his arrival. His entire luggage on the August trip consisted of two bags. However, while there in the years 1948 and 1949, he earned, according to his statement, from $300 to $400 a month, in addition to his income from Oregon sources. His records of income from his Idaho operations were not segregated from the Oregon business. Indeed, the tax accountant for the Oregon nursery, who made the nursery partnership returns and personal returns for the partners for the tax years of 1948 and 1949, had, as we have noted, no knowledge that Elwert was conducting a separate business in Idaho during that time. The records from the Idaho "business" for those years were consolidated in the tax returns made for the Oregon nursery and filed with the state of Oregon and the collector for the federal Oregon district. No income tax returns were made to the state of Idaho for 1948 or 1949, notwithstanding the requirements of the law of that state. (§§ 63-3001—63-3088, Idaho Code, particularly concerning resident persons receiving income outside the state of Idaho. § 63-3013(b) 7.)

Elwert had with him a Lincoln automobile and at times various trucking vehicles of the Oregon company;

but he failed to take Idaho-required licenses for his automobiles or to secure a motor vehicle operator's license during the period of his so-called residence in that state, and he continued to operate these vehicles under Oregon licenses and under the authority of his Oregon operator's license. (See §§ 49-107, 49-307 and 49-308, Idaho Code.)

Although ostensibly in Idaho to set up a permanent nursery business in that state and while there actively engaged in the sale of nursery products, Elwert at no time sought to or did secure a license for that purpose as required by the Nurseryman's and Florist's Bond and License Code of that state (§§ 22-2301 et seq., Idaho Code). He knew of the necessity for this but gave trivial and specious reasons for not doing so.

## Motive

Enough has already been said to indicate that one of the impelling forces taking Elwert to Idaho was his tawdry affair with Greta.

There is yet another and collateral reason. We refer again to Elwert's jaunt to Hawaii in the company of his mistress. There they spent a week in the latter part of July, 1948. There they registered prematurely as Mr. and Mrs. Leo Elwert. It was an excursion fraught with punitive possibilities for couples not united in marriage. That Elwert was not unmindful of the criminal potentialities of his imprudent expedition across state lines is indicated by his own testimony. It is a fair inference that this situation alone may have caused him many anxious moments from whence arose the realization that marriage to his companion on the Pacific tour might afford immunity to a criminal prosecution predicated upon this bit of indiscreet philandering. It is noteworthy that whether fear of the

law's heavy hand or misguided motives of affection prompted his action, he was, within three months after his return from Honolulu, in the midst of an active implementation of processes designed to rid him ultimately of wife No. 1 and place him in a position to legally embrace wife No. 2. Idaho, under the circumstances, seemed to furnish a convenient and appropriate haven in which to quicken this highly desired result.

It is appropriate to observe at this point that the defendant asserted his only reason for not filing the divorce suit in Washington county, the place of his Oregon residence, was a desire to save his wife Mary and their children any embarrassment from such a proceeding. This self-serving sentimental observation places a heavy strain on credulity in the face of his open and notorious erotic conduct so shortly before and when family and family ties were a matter of secondary, if any, consideration.

### *Miscellaneous*

We cannot close our reference to the facts without taking notice of the deception which the defendant practiced upon the Idaho court. One example will suffice. The court took an active inquisitorial part in seeking proof of domicil. In response to the judge's questions, Elwert made the following answers:

"Q Your wife has the entire [Oregon] business?

"A She has the entire business.

"Q You have not a chance of getting a penny out of it?

"A Not a thing."

Elwert's responses were manifestly false. Up to the time of the trial of this case, no settlement of any kind had then or thereafter been made with his wife.

They had been and were then and thereafter carrying on the partnership represented by Tualatin Valley Nurseries. He was then and ever since his departure from Oregon in October, 1948, had been actively participating in its management. Based on the "conservative" figure of $125,000 which he gave to the circuit court in this case, he was by his own calculations worth at least $67,500 at the time he gave the answers to the judge's inquiries in the Idaho case. At the trial in this case he represented that he had additional sources of income, some of which were from properties acquired before his flight to Idaho.

We note with some interest and curiosity that notwithstanding that Elwert claimed Boise, the capital of Idaho and the county seat of Ada county, as his place of residence and seat of his business operations in that state, he, nevertheless, laid the venue for the divorce suit in Gooding in the county of Gooding, a relatively small town and a place more than 100 miles to the east of Boise. We do not challenge his legal right to do so (§ 5-404, Idaho Code) but cannot suppress our wonderment for the reasons for such action under all the circumstances revealed here. Was he afraid that someone in or near Boise would challenge his claim to domicil if he had filed there? Was he attempting to make it more expensive and difficult for his wife to appear; or did he mistakenly expect to attain some advantage through a more distant judge than he could expect in a Boise court? Situated as he was, it was, in our opinion, an act on his part that further challenges his claim to good faith.

We note, too, with no little surprise that in an affidavit made by him and filed in the divorce matter respecting Mary Elwert's place of residence, he gives it as Portland, Multnomah county, Oregon, notwithstand-

ing that so far as the record here shows, she has continuously resided in the family home near Sherwood in Washington county, where he had seen her when there a week or ten days before. This circumstance is not one of controlling importance here but is referred to only as a further demonstration of Elwert's careless regard for the truth in the Idaho suit.

The appellant devotes nearly 40 pages of his brief to an impeaching of the testimony given by Mrs. Elwert. He claims that she is wanting in credibility, charging her with evasion and the giving of false testimony. In one instance, this attack is predicated upon the mistaken assumption that she was the party introducing certain evidence which he finds so objectionable. This particular evidence against which defendant inveighs so vigorously was placed in the record by defendant himself as his Exhibits 27 and 28.

We have examined Mrs. Elwert's testimony with critical care. Taking it in its entirety, together with the abundant corroboration of much of it elsewhere supplied by the record and with no small part out of the mouth of the defendant, we find we cannot concur in this attempt to discredit the plaintiff as the defendant would have us do. We are certain that the circuit court gave her testimony proper weight in arriving at its conclusion, aided, as it was, by the additional advantage of being able to observe the witnesses during the trial.

It cannot reasonably be claimed that one set of inferences rather than another touching upon the acquisition of a new domicil in Idaho by the defendant cannot be drawn from the circumstances attending his Idaho residence and divorce.

Our own careful and laborious examination of this extensive record impels the opinion that the plain-

tiff has sustained the burden imposed by law in a matter of this kind; that the Idaho court was defrauded into the belief that it had jurisdiction of the divorce suit, when, in fact, Elwert had gone into that state for the sole purpose of getting a decree; that he had not intended to become a resident and did not, in fact, actually become one; and that he never attained a real domicil therein but only the appearance thereof. Defendant did not burn his bridges behind him but, on the contrary, kept them in a state of constant use and repair.

The decree will be affirmed.

HAY, J., did not participate in this decision.