IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Income Tax

JOHN R. KAUFMANN )
and LINDA R. KAUFMANN, )
                                          )
           Plaintiffs, )    TC-MD 120616C
                                          )
      v. )
                                          )
DEPARTMENT OF REVENUE, )
State of Oregon, )
                                          )
          Defendant. )    **DECISION**

       Plaintiffs have appealed Defendant's Notice of Deficiency Assessment for 2010. Trial in

the matter was held in the Tax Court courtroom in Salem on March 28, 2013. Plaintiffs were

represented by W. Scott Phinney, Attorney at Law. Defendant was represented by Kyle Quiring,

Auditor, Oregon Department of Revenue. John Kaufmann (John)[1] testified for Plaintiffs. Linda

Kaufmann (Linda) did not testify or even appear at trial. Defendant did not present any

testimony or introduce any exhibits into evidence.[2] Plaintiffs' Exhibits 1 through 5 were

admitted at trial without objection.

## I. STATEMENT OF FACTS

       At trial, John testified to the following. John, who at the time of trial had recently retired,

worked in the energy field for 32 years. He began his career in New York, and after several

years moved to Oregon to work for the Oregon Department of Energy (DOE). John worked for

the Oregon DOE for 29 years. John met and married his wife Linda here in Oregon and the

---

[1] When referring to a party in a written decision, it is customary for the court to use the last name. However, in this case, the court's decision recites facts and references to two individuals with the same last name, Kaufmann. To avoid confusion, the court will use the first name of the individual being referenced.

[2] Defendant did exchange seven exhibits, marked A through G, but never presented them at trial or asked that they be admitted. Accordingly, the court will not consider them in rendering its decision.

couple had several children,[3] all born in Oregon. In 2010 Plaintiffs had a daughter (presumably their youngest child) in her final year of college at Gonzaga University, which is in the state of Washington.[4] John and Linda own a home in Salem, Oregon, that is approximately 1,800 square-foot in size. The date of acquisition and any other information about the home is not known because John gave scant testimony on that subject and Defendant never referred to its exhibits (which include information on the home), or requested that its exhibits be admitted into evidence.

In the latter part of 2009, John, who at that time was 61 years of age, accepted a job with Pacific Northwest National Laboratory (PNNL), at its main campus in Richland, Washington, a city approximately 275 miles northeast of Salem, Oregon.[5] (Ptfs' Ex 4 at 8.) Plaintiffs submitted a letter from PNNL dated November 13, 2009, congratulating him on his formal invitation "to join of the staff at Pacific Northwest National Laboratory," working as a Manager, Level II. (Ptfs' Ex 3 at 2.) That letter supports John's testimony that PNNL is an energy research company that operates for the benefit of the U.S. Department of Energy. John testified that PNNL is one of only 10 such companies operating in the United States and that the job with PNNL was a "step up" career-wise from his 29 years of service with the Oregon DOE. John further testified that the PNNL job paid approximately 50 percent more than his Oregon DOE job. Those two factors (career advancement and money) were the primary reasons John accepted the PNNL job.

John began working for PNNL on January 5, 2010. He signed a rental agreement December 11, 2009, for the lease of an approximately 1,100 square foot apartment in Richland,

---

[3] John testified that he had a wife and "children," which suggests more than one child. However, John testified only briefly about his family, and gave little information about his children. Plaintiffs' 2010 tax return lists one child named Nora as a dependent. (Ptfs' Ex 5 at 2.)

[4] Gonzaga University is in the adjoining state of Washington. (http://www.gonzaga.edu/).

[5] John testified that the distance was 275 miles, and submitted a document with that same figure. (Ptfs' Ex 1 at 1.)

Washington. (Ptfs' Ex 1 and 5.) The initial lease was for six months, from January 4, 2010, through July 31, 2010. (*Id.*) The agreed-upon rent was $850 per month. (*Id.*) John testified that he executed two subsequent leases for that apartment, where he apparently lived until September 2011, when, according to his testimony, John terminated his employment with PNNL because: 1) he was unhappy with the job – he was working long hours, it was extremely stressful, and it was difficult to deal with the government officials in Washington D.C.; and 2) his wife could not find work in Washington after spending two summers looking for employment in that area that was in her field.

John testified that his wife Linda, who was employed as an academic counselor at Chemeketa Community College in Salem, Oregon, remained in Salem, living in the couple's 1,800 square foot home, because of her job in Salem.

John testified that his career move from Oregon DOE to PNNL happened quickly and he did not really "plan the whole thing out." He envisioned that he would move to Washington, rent an apartment, that Linda would look for work in the Richland, Washington area during the summer of 2010 and, if unsuccessful, would look again in the summer of 2011. John further testified that he thought he would work until he was 65 to 68 years old (4 to 8 years). John testified that there were two colleges in the Richland area; a branch of Washington State University, and Columbia Basin Community College, and that jobs at colleges tend to open up in the summer months (June through August). John testified that he and Linda looked unsuccessfully for work in the summer of 2010, and again in 2011.

When questioned by his attorney, John testified that, although they had not really planned things out, he thought they would probably sell their Oregon home if Linda was able to find a job in Washington. John further testified that he had no real plan for where he would live upon retiring, but that he and Linda often talked about retiring "out-of-state." John testified that they (he and Linda) might have stayed in Washington if she had found a job there, or moved to

Minnesota, where much of his wife's family lives, but that he had no plan to return to Oregon to retire.

John testified that he worked in Richland on a full-time basis for the first half of 2010. He further testified that the expectation when he started the job was that he would be "working in Richland on a full-time basis; not working remotely from some other location. They made it very clear to me that the job was in Richland and I was expected to be there." However, John testified that during that time period his wife's brother had a heart attack in February 2010, her father died in May or June 2010, and a niece was sick and ultimately died around Thanksgiving that year (2010). Those events put stress on John's wife Linda and she needed his presence and support at home in Oregon. John testified that at that point he approached his employer PNNL for permission to work out of Salem on occasion, and as a result, they signed an "Alternative Work Agreement."[6] (*See* Ptfs' Ex 3 at 5.) A letter from the employer indicates that the agreement was effective beginning May 24, 2010. (*Id.* at 9.) John testified that that agreement allowed him to work up to 50 percent of his time from Salem. He stressed that it was "on a temporary basis, up to 50 percent of my time." John's testimony as to when his request to work from Salem was made and when the agreement was reached with his Washington employer were strikingly vague. There is further discussion on that matter below.

John then testified that, as it turned out, he did not spend 50 percent of his time in Oregon. He testified that, as a manager, with the projects and work that he had to tend to "up there," the job demanded that he spend a lot of his time in Richland. John further testified that over the course of the year he spent about one-fifth of his time (approximately 17 percent to 20 percent of his days) in Salem, and that the rest of the time he was in Richland.

/ / /

/ / /

___

[6] That agreement is actually titled Alternative Workplace Agreement. (Ptfs' Ex 3 at 5.)

John testified that he came back to Salem more frequently in 2010 due to family sicknesses and deaths. He went on to testify that he would primarily come back and work in Salem a week at a time, then go back for two or three weeks and work in Richland.

The court found John's sworn testimony to be notably vague as to precisely when he received approval to work remotely from his house in Salem, Oregon, and when he began doing so. There is an employer letter dated April 29, 2011, stating the agreement allowed him to begin working in Oregon in June 2010, but a formal draft agreement titled "Alternative Workplace Agreement," submitted into evidence by Plaintiffs, was executed by the employer *prior* to John's hire in January 2010. (Ptfs' Ex 3 at 5-7, 9.)

Plaintiffs submitted a letter over the signature of John and addressed to the Oregon Department of Revenue which states in part: "I began full-time employment with PNNL and moved to Richland and established residence there in January, 2010. Because of illnesses in the family, I received permission to work occasionally from Oregon beginning in June, 2010. Because of work-related travel and meetings that require my presence, I still spent the majority of my time from June-December in Richland." (*Id.* at 8.) The employer letter states: "Mr. Kaufmann worked full-time in Richland from his date of hire through the end of May, 2010. From January 5, 2010 through December 31, 2010, John worked 2,037 hours, excluding holiday, vacation and personal holiday. Effective May 24, 2010, John was approved to work up to 50% of his time, on a temporary basis, from a remote location in Oregon. At that time PNNL began to deduct Oregon income taxes from his paycheck." (*Id*. at 9.) That letter goes on to state: "Mr. Kaufmann continues to work the majority of his time in Richland, Washington. * * * He works approximately one-quarter time from Oregon. PNNL does not keep precise records of which location Mr. Kaufmann performs his work." (*Id*.)

The agreement John referenced during trial, and submitted with his trial exhibits, although not signed or dated on the third of three pages, states on page 1: "Employer ID: *Offer*

DECISION  TC-MD 120616C                                                                                                  5

*pending*[.]"  (Ptfs' Ex 3 at 5 (emphasis added).)  Additionally, that agreement includes the

following in part:

> "**Dates of Offsite Work:**
> "This assignment is temporary, and *the work off-site will commence on the date of hire* and will be on-going, with an *annual re-evaluation* to assess continued suitability to the project and client needs.
>
> "**Nature of the Work:**
> "*Pending Hire*:  John Kaufmann *will* provide technical and leadership expertise * * *
>
> "**Justification for Offsite Work:**
> "The staff member has requested approval for temporary off-site work at home in order to care for a family member. *Work duties* are primarily preparing and reviewing technical documentation, and *are conducive to being accomplished effectively and efficiently offsite*. * * *
>
> "**Offsite Work Location:**
> "The staff member's *primary work location will be* in a separate office established *in the staff member's residence. Initially*, this residence will be at 1379, Ptarmigan Court NW, *Salem, Oregon* 97304-2844.
>
> "* * * * *
>
> "**Work Performance Measures:**
> "The staff member's manager will evaluate the work-at-home assignment against the alternative workplace criteria on an annual basis."

(Ptfs' Ex 3 at 5-6 (emphasis added).)

On October 22, 2010, John registered his 2005 Honda Civic in Washington, obtained a

Washington driver license, and registered to vote in Washington.  (Ptfs' Ex 1 at 10- 11.)

Finally, Plaintiffs submitted a utility bill for electricity associated with John's apartment

in Washington, and excerpts from bank statements from U.S. Bank related to an account solely

in John's name.  (Ptfs' Exs 1 at 14; 4 at 1-4.)  The utility bill is for the month of February 2010.

(Ptfs' Ex 1 at 14.)  The bank statements cover a five month span from December 10, 2010,

through May 10, 2011, but exclude the period March 10 through April 8 (the "March"

statement).  (Ptfs' Ex 4 at 1-4.)  Also, each statement indicates that it is either "Page 2 of 2" or

"Page 2 of 3."  (*Id.*)

## II. ANALYSIS

Oregon imposes a state income tax on every resident of this state and every nonresident with Oregon-source income. ORS 316.037(1), (3).[7] Oregon defines a "resident" as "[a]n individual who is domiciled in this state * * *." ORS 316.027(1)(a)(A). There are exceptions not here relevant, among the more common is an individual "domiciled" in Oregon who "(i) [m]aintains no permanent place of abode in this state[,] (ii) [d]oes maintain a permanent place of abode elsewhere[,] and (iii) [s]pends in the aggregate not more than 30 days in the taxable year in this state[.]" ORS 316.027(1)(a)(A).[8]

This case focuses on John's residency/domicile in 2010. The parties agree that Linda lived and worked in Oregon. The taxation of her income, therefore, is not in question. The parties also agree that John spent more than 30 days in Oregon in 2010, the year at issue. Thus, the exception discussed above does not apply and the inquiry focuses on the question of John's domicile.

As this court recently noted in *Ashby v. Department of Revenue* (*Ashby*), __ OTR __ (Aug 28, 2012), Oregon statutes do not define the word "domicile." (slip op at 8.) The court in *Ashby* looked to Black's Law Dictionary, which provides the following definition:

> "The place at which a person has been physically present and that the person regards as home; a person's true, fixed, principal, and permanent home, to which the person intends to return and remain even though currently residing elsewhere."

*Id*. (citing *Black's Law Dictionary* 523 (8th ed 1999)).

/ / /

---

[7] Unless otherwise noted, all references to the Oregon Revised Statutes (ORS) are to 2009.

[8] There are other exceptions cutting both ways. For example, "resident" includes individuals *not* domiciled in Oregon who "maintain[] a permanent place of abode in this state and spend[] in the aggregate more than 200 days of the taxable year in this state unless the individual can prove that [he or she] is only in the state for a temporary or transitory purpose." ORS 316.027(1)(a)(B). Certain other less common exceptions not here relevant are also included in that statute, including an exemption for qualified individuals with a tax home in a foreign country as provided in IRC § 911(d)(1), per ORS 316.027(1)(b).

The Oregon Supreme Court has in the past stated that domicile is a *common law* concept comprised of two components: "[(1)] a fixed habitation or abode in a particular place and [(2)] an intention to remain there permanently or indefinitely." *dela Rosa v. Dept. of Rev.* (*dela Rosa*), 313 Or 284, 289, 832 P2d 1228, 1231 (1992) (citing *Elwert v. Elwert*, 196 Or 256, 265, 248 P2d 847 (1952)). In *Ramsey v. Department of Revenue* (*Ramsey*), 7 OTR 478, 481 (1978), this court stated that an "abode" is generally understood as signifying "a building or shelter which is the dwelling place of a person."

A similar definition is found in the Oregon Department of Revenue's Administrative Rule 150-316.027(1)(1)(a).[9] That rule defines "domicile" in part as "the place an individual considers to be the individual's true, fixed, permanent home" and as "the place a person intends to return to after an absence." *Id.*

While an individual can have more than one residence, he "can have but one domicile[.]" *dela Rosa*, 313 Or at 289 (citation omitted); *see also Zimmerman v. Zimmerman*, 175 Or 585, 591, 155 P2d 293 (1945); *see also* OAR 150-316.027(1)(a).

Given the inherent difficulties in ascertaining intent, "triers of the fact of domicile rely heavily upon the overt acts of the individual as true indicators of his state of mind. Nevertheless, the whole aim of the inquiry is to discern the true intent." *Hudspeth v. Dept. of Revenue*, 4 OTR 296, 298-99 (1971); *see also dela Rosa*, 313 Or at 289-90 (stating that domicile, while based on intent, must be established by all the facts and circumstances). Thus, "determination of an individual's domicile is based on intent supported by facts and circumstances rather than merely the statements of the individual[.]" *Butler v. Dept. of Rev.*, TC-MD No 050801D, WL 2041284 at *4 (Jul 18, 2006) (citations omitted). Factors contributing to a determination of domicile "include family, business activities[,] and social connections." OAR 150-316.027(1)(1)(a).

/ / /

---

[9] All references to the Oregon Administrative Rules (OAR) are to those in effect in 2010.

"The law is also clear that once domicile is established or determined to be in a particular location, it remains there until the person establishes a new domicile." *Duncan v. Department of Revenue*, TC No 4315, WL 792454 at *1 (Nov 3, 1998). In order to change one's domicile, the individual must (a) intend to abandon their former domicile; (b) intend to acquire a new domicile; and (c) actually reside in the new home or residence. *Davis v. Dept. of Rev.*, 13 OTR 260, 264 (1995) (citing *In Re Noyes' Estate*, 182 Or 1, 185 P2d 555 (1947), stating that "[i]n order to change domicile, an individual must not only establish a residence in the new place but have an intention to abandon the old domicile and acquire a new one").

Domicile questions, particularly those that go through administrative review and are then appealed to this court and go to trial, are often particularly difficult to decide. The difficulty stems from the fact that domicile hinges on the subjective element of intent, which in turn is decided based on objective actions, and typically, as in this case, the facts present a less than complete picture. More thorough cross-examination by Defendant and the testimony of John's wife Linda likely would have filled in some questions and either buttressed John's testimony or scuttled the case.

However, after carefully and thoughtfully considering the matter, the court is not persuaded by a preponderance of the evidence that John intended to abandoned his Oregon domicile or intended to acquired a new domicile in Washington. To put it another way, it is not clear to the court that John established a fixed habitation or abode in Richland with an intention to remain there permanently and definitely.

John accepted a job in Washington, a state just north of and contiguous to Oregon, after working in Oregon for 29 years. John's new job was only about 275 miles away from his home in Salem, Oregon, where his wife Linda remained.[10] (Ptfs' Ex 1 at 1-2.) His wife Linda

---

[10] A more precise measurement, if indeed 275 miles is not precise, is not important for purposes of the court's decision. That approximation is helpful to readers unfamiliar with the two locations (Salem, Oregon and Richland, Washington), as it gives them a rough idea of how far Kaufmann moved when he accepted employment in

DECISION  TC-MD 120616C                                                                                          9

remained in their home in Salem, Oregon, continuing to work at her job at the local community college, while John lived in an apartment in Washington. John testified that he never began looking for a house to purchase in Washington, and had no plans to do so unless and until his wife Linda was able to find a job near his place of employment in that state. There was no testimony on what if any social ties John established in Washington (*e.g.*, clubs, church or other organizations, family friendships). John did not get his Washington driver license, Washington vehicle registration or voter registration until October 22, 2010. (Ptfs' Ex 1 at 10-11.) John registered one vehicle, a 2005 Honda Civic at that time. (*Id*. at 11.) That may well correspond to the time when John began contemplating his income tax situation. No testimony was presented as to what other vehicles Plaintiffs owned that were registered in Oregon, but the court assumes the couple had at least one other vehicle that John's wife Linda used to commute back and forth to work, etc.

Courts often look at where a taxpayer in situations such as in this case (husband and wife living in separate states, one having moved from the family home to another state for employment reasons, with the spouse remaining behind in that home) spends major holidays, but the record in this case is of no help in that regard. John testified that in 2010, he was in Richland, Washington, on Memorial Day and Independence Day, that he and Linda were in Minnesota over Thanksgiving due to the death of a niece, and that he spent the Christmas/New Year season and possibly Easter with Linda in Salem, Oregon. John further testified that he was in Oregon for vacation for a week or so in August 2010 because Linda's relatives came to visit and, after gathering at their Salem home, they all went to the Oregon coast for at least a few days of vacation.

/ / /

---

Washington (275 miles as opposed to, say, 2,000 miles). The trip to Richland can presumably be made in approximately 4 to 5 hours (the majority of the trip can be driven on interstate freeways).

As for John's bank records, they cover a five month period that does not begin until December 10, 2010. Moreover, those records pertain to only one credit card, and in each instance only one of the two to three pages of the credit card statement was submitted. (Ptfs' Ex 4.) The statements show expenditures in both Washington and Oregon. Plaintiffs insist that the statements show a heavier pattern of spending in Washington as compared Oregon and, while that may be true, Plaintiffs did not submit any statements from the earliest months of the 2010 calendar year, especially January through April. Bank records from that time-frame would be insightful, because John testified that he spent more of his time in Washington during the first half of 2010. Moreover, all but one of the credit card statements submitted show expenditures both in Washington and Oregon. (*Id.*) Conspicuously absent were any of Plaintiffs' other bank records. Such records would have helped the court determine the couple's overall spending habits and presumably would have revealed where John's monthly paycheck was deposited and how much if any of those funds landed in Oregon.

At the end of the day, several facts stand out in this case. First, John testified repeatedly that he had no real plans regarding various aspects of his home and family life (*e.g.*, whether they would keep or sell their Salem Oregon home, where they might live upon retirement). The court believes that to be true. Second, the court accepts John's testimony that he moved up to Richland "indefinitely." However, the term indefinite, is, like other words used to define domicile, somewhat inexact. And, more importantly, the court believes that John's "move" up to Richland was contingent upon several factors, including Linda finding a job in that area so that the two could be together. The law is clear that plans of future intent are insufficient to establish a change of domicile. "The intent to abandon an old domicile and to acquire a new one must be a present intent." *Dane v. Dept. of Rev.*, __ OTR __ (Aug 28, 2012 (slip op at 8) (citing *Oberhettinger v. Dept. of Rev.*, 4 OTR 62, 64 (1970)); *see also Ramsey* at 481. Another important factor to John was whether he liked his new job at PNNL. John in fact testified that if

DECISION  TC-MD 120616C                                                                 11

the job had been better, and Linda had an able to get a job in Richland, they would be there "today" (*i.e.*, at the time of trial in March 2013). As it turned out, neither occurred. After reportedly looking for work in the summer of 2010 and again in 2011, Linda was unable to find a job in Washington. John testified that his unhappiness with his job, coupled with Linda's inability to find a job after looking at second summer, led him to resign from his job at PNN in September 2011, less than two years after beginning his new job there. Upon quitting his job, John moved back to Oregon.

The court finds it largely irrelevant that John bought furniture in Washington after he rented an unfurnished apartment near his new job location. The court views John's utility bill and bank statements in a similar fashion. There is no question that he was in the state of Washington, and it is reasonable that he would incur expenses for electricity to live in his apartment, and that he would spend money in and around the town of Richland where he was staying.

Plaintiffs' case may have been helped if John's wife Linda had testified. Assuming her testimony aligned with John's, such testimony would have helped corroborate John's assertions that he intended to abandon his domicile in Oregon and acquire one in Washington. For example, Linda could have testified as to how much time her husband spent in Oregon and Washington, as well as elsewhere, whether she really did plan to look for a job in Richland and move up there, and her thoughts about the couple's retirement plans.

Finally, the court is somewhat perplexed by some of the apparently contradictory evidence. For example, John testified he arranged to work from home part-time in mid-2010 because of family deaths and illnesses that brought a great deal of stress on his wife. Yet the agreement with the employer (albeit neither signed nor dated), submitted into evidence by Plaintiffs as part of Exhibit 3, titled "Alternative Workplace Agreement," appears to have been reached, or at least anticipated, prior to the time John commenced working for PNNL in early

DECISION TC-MD 120616C                                                                                12

January 2010. That agreement, which John specifically referred to during his testimony, refers to John as a "pending hire," and indicates among other things that "[t]he staff member has requested approval for temporary offsite work at home," that he would be working from his residence in Salem, Oregon, and that "the work offsite will commence on the date of hire and will be ongoing, with an annual re-evaluation to assess continued suitability to the project and client needs." (Ptfs' Ex 3 at 5.) Regardless of whether or not that agreement was reached prior to his hire, John clearly discussed with his prospective employer the possibility of working in Oregon, traveling to Washington for necessary meetings another matters requiring his physical presence, yet John swore under oath that the only reason he worked at all from his Salem home was because there were deaths and illnesses in the family and his wife needed him at her side.

### III. CONCLUSION

For the reasons set forth above, the court concludes that Plaintiffs' have failed to establish by a preponderance of the evidence that John, one of the two Plaintiffs in this matter, was domiciled in Washington in 2010, but was instead domiciled in Oregon, making him a resident of this state and subjecting his wages that year to taxation by Oregon. The court does not believe that John established a fixed habitation or abode in Washington with an intention to remain there permanently or indefinitely. Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiffs' appeal is denied.

Dated this ___ day of May 2013.

_____
DAN ROBINSON
MAGISTRATE

*If you want to appeal this Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.*
*Your Complaint must be submitted within <u>60</u> days after the date of the Decision or this Decision becomes final and cannot be changed.*

*This Decision was signed by Magistrate Dan Robinson on May 8, 2013. The court filed and entered this Decision on May 8, 2013.*