Mary A. ELWERT, Plaintiff,

v.

**PACIFIC FIRST FEDERAL SAVINGS AND LOAN ASSOCIATION OF TACOMA, WASHINGTON, a Corporation, The Bank of California, N. A., a Corporation, Defendants and Third-Party Plaintiffs,**

Leo ELWERT, Third-Party Defendant.

Civ. No. 7857.

United States District Court
D. Oregon.

Jan. 31, 1956.

Norman B. Kobin, Portland, Or., Peter S. Herman, Salem, Or., for plaintiff.

Lofton L. Tatum, of Wood, Matthiessen, Wood & Tatum, Portland, Or., for defendants Pacific First Federal Savings & Loan Ass'n of Tacoma, Wash., and Bank of California, N. A.

S. J. Bischoff, Portland, Or., for third-party defendant, Leo Elwert.

EAST, District Judge.

This action came on for trial before the Court without a jury, the plaintiff, Mary A. Elwert, hereinafter referred to as Mary, appearing in person, and being represented by her counsel, Norman B. Kobin and Peter L. Herman, the defendant, Pacific First Federal Savings and Loan Association of Tacoma, Washington, a corporation, hereinafter referred to as Loan Association, and the defendant, The Bank of California, N. A., a corporation, hereinafter referred to as Drawee Bank, appearing by and through their counsel, Lofton L. Tatum, and Leo Elwert, third party defendant, hereinafter referred to as Leo, appearing through his counsel S. J. Bischoff,

It conclusively appears from the undisputed evidence in the case and from the pre-trial order, that:

At all pertinent times the Loan Association "was and is a corporation organized and existing under the laws of the United States relating to federal savings and loan associations, with its principal office in Tacoma, Washington, and an office in Portland, Oregon;" the Drawee Bank "is a corporation organized and existing under the national banking laws of the United States, with its principal office located in the State of California, and (a) branch office located in Portland, Oregon;"

Mary, at all pertinent times, was a resident and a citizen of the State of Oregon, and she and Leo were wife and husband and also co-partners in the ownership and operation of a co-partnership known as the Tualatin Valley Nursery, with its principal place of business at Sherwood, Washington County, Oregon;

That during the year, 1945, Mary and Leo, then being wife and husband, became the owners by an estate by the entirety of certain timber lands consisting of two parcels described as follows:

(a) The West one-half of the Southwest quarter, the Southeast quarter of the Southwest quarter, the Southwest quarter of the Southeast quarter of the Section 8, Township 13, South, Range 8 West of the Willamette Meridian, Lincoln County, Oregon.

(b) The Southeast quarter of Section 32, Township 12 South, Range 8 West of the Willamette Meridian, and Lots 3 and 4 in the Southeast quarter of the Northwest quarter and the Southwest quarter of the Northeast quarter of Section 4, Township 13, South, Range 8 West of the Willamette Meridian, Lincoln County, Oregon.

and that the purchase price paid by Mary and Leo for said timber lands was from moneys accumulated by said parties in the course of their co-partnership ownership and operation of said nursery business;

That on or about the 20th day of February, 1948, the Coos-Pacific Timber Company, a subsidiary of Dant and Russell, Inc., entered into an executory contract wherein Mary and Leo agreed to sell and the said timber company agreed to purchase the aforesaid timber land for the sum of $55,090.98. The initial down payment upon said purchase price, in the sum of $27,592.98, was paid by a check payable to the order of Leo Elwert. The proceeds of which check were deposited in the Tigard Branch of the United States National Bank on or about February 25, 1948, in an account designated Leo or Mary Elwert "Real Estate Account;"

Subsequently maturing installments of purchase price under said contract were made payable by some six checks of the said Dant and Russell, Inc., payable to the order of Leo and Mary Elwert. The disposition of the proceeds of these checks are of no materiality to this matter except the following three checks which are the subject of plaintiff's action:

1. (Exhibit 5) Check, dated February 17, 1949, in the amount of $7,287.-50, drawn on Drawee Bank, and payable to the order of Leo and Mary Elwert, the proceeds of which check were on or about February 25, 1949, deposited with the Loan Association in an account numbered 94380 under the name of Mr. G. M. Bloomquist.

2. (Exhibit 6) Check dated August 3, 1949, in the amount of $7,012.50, drawn on the Drawee Bank, payable to the order of Leo and Mary Elwert, the proceeds of which check were on or about August 23, 1949, deposited with the Loan Association in said account No. 94380.

3. (Exhibit 8) Check dated February 26, 1950, in the amount of $7,012.50, drawn on the Drawee Bank, payable to the order of Leo and Mary Elwert, the proceeds of which check were deposited with the Loan Association on March 7, 1950 in account No. 94954, held in the name of "L. C. Albee."

That the aforesaid Loan Association accounts numbered 94380 and 94954, were each opened and established by Leo

through the acquiescence of an officer of Loan Association under the fictitious names of "Mr. G. M. Bloomquist" and "L. C. Albee," as aforesaid, respectively.

That Loan Association credited said accounts with the amounts of said checks as aforesaid and then forwarded said checks through the Portland clearing house for collection to the Drawee Bank, which Drawee Bank, in the course of normal banking business debited the amount of said checks against the account of the maker, Dant and Russell, Inc., and credited the account of Loan Association.

That each of the said three checks upon presentation to the Loan Association were apparently duly endorsed by Leo Elwert and Mary Elwert.

That subsequently and during the months of September and October, 1950, said two accounts numbered 94380 and 94954 were reduced to zero in amount of funds therein by reason of withdrawals by Leo, the ultimate disposition of which funds is unexplained, except that it is conclusive that Mary received no part thereof.

That on or about May 16, 1950, Mary and Leo duly executed a deed conveying legal title to the aforesaid timber lands to the purchaser thereof.

Mary contends that she was the owner of an undivided one-half interest in and to the proceeds of said three checks and that her purported endorsement, "Mary Elwert" on each of said three checks was not authorized or otherwise genuine and in fact were forgeries, and that by reason of the contended forgery of her endorsement thereof, the collection thereof by the Loan Association and ultimate payment thereof by the Drawee Bank constituted a conversion of her property to their own use.

The Loan Association contends:

That this court lacks jurisdiction over it because the controversy herein as between itself and Mary "is not between citizens of different states."

That Mary's endorsements were made by Leo upon the actual authority, knowledge and consent of Mary, or, alternatively, upon the implied and apparent authority of Leo.

That Mary, by reason of her actions, delay and failure to notify Loan Association within a reasonable time after said three checks had been negotiated and after Mary, with reasonable diligence knew or should have known of the endorsement and negotiation of said checks, has ratified the endorsement appearing upon said checks and is estopped from asserting any lack of authority on the part of Leo, and, further, that by reason of said actions, delay and failure to notify Loan Association, has prevented Loan Association from recouping the amount of said checks from the account of Leo with Loan Association.

That Leo and Mary were the owners of said three checks either as tenants by the entirety or as tenants in partnership and that therefore Leo had authority to exercise full dominion and control over said checks and funds obtained therefrom.

That if Loan Association should be held liable to Mary by virtue of honoring said three checks with said endorsements that Loan Association is entitled to recover such sums for which it is so liable from Leo as third-party defendant by reason of his act or actions in endorsing said checks.

The contentions of Drawee Bank, for the purposes of this action, are identical with the contentions of Loan Association, except that Drawee Bank concedes the Court's jurisdiction over it.

Leo, as third-party defendant, contends and adopts each and every one of the aforesaid contentions of Loan Association and Drawee Bank, except that he denies that Drawee Bank would be entitled to judgment against him in the event that plaintiff prevails. Further, that there is no privity between Mary and either of the corporate defendants and that the said checks and proceeds thereof were owned by Mary and himself as tenants by the entirety, and, finally, that the sole controversy presented by the contentions of all of these parties re-

solves to one between Mary and himself determinable in a proceeding for an accounting between them for their partnership affairs and that by reason thereof this Court has no jurisdiction of the subject.

It appears from a preponderance of all the evidence in the case that Mary did not at any time receive for her own use and benefit any of the proceeds of the purchase price of said timber land sale and that throughout the entire transaction and the collection of the installments represented by said six checks Leo acted with the intent to and did defraud and cheat Mary of her interest therein. That Mary did not at any time have any actual knowledge of the issuance of said three checks cashed by Loan Association as aforesaid, until some time during the month of July, 1952, at which time she was confronted by agents of the United States Internal Revenue Service concerning a delinquency of income tax by reason of said sale and other financial matters of the parties.

It further appears that during these times Mary and Leo were in the throes of domestic difficulties arising from, to say the least, faulty conduct on the part of Leo, resulting in separation and divorce litigation ultimately concluded in Mary's favor by decision of the Supreme Court of the State of Oregon, reported in Elwert v. Elwert, 196 Or. 256, 248 P.2d 847, 36 A.L.R.2d 741, and of which this Court takes judicial notice.

Question of Court's Jurisdiction Over Loan Association by Reason of Diversity of Citizenship

So far as this Court is advised there appears to be no reported case on the question of the Federal Courts' jurisdiction over a Federal Savings and Loan Association on the sole ground of diversity of citizenship and this question is now one of first impression.

Loan Association owes its existence to the provisions of the Home Owners Loan Act of 1933, and particularly to that part of the Act now codified as Title 12, § 1464, U.S.C.A. which section, inter alia, provides:

"(a) In order to provide local mutual thrift institutions in which people may invest their funds and in order to provide for the financing of homes, the Board is authorized, under such rules and regulations as it may prescribe, to provide for the organization, incorporation, examination, operation, and regulation of associations to be known as 'Federal Savings and Loan Associations,' and to issue charters therefor, giving primary consideration to the best practices of local mutual thrift and home-financing institutions in the United States."

It appears that pursuant to this authority, by resolution adopted dated March 8, 1937, the Home Owners Loan Bank Board issued Loan Association's charter, and that Articles I and II thereof provide as follows:

"1. Name—The name of the Federal savings and loan association hereby chartered (hereinafter referred to as the "association") is Pacific First Federal Savings and Loan Association of Tacoma.

"2. Office—The home office of the association shall be located at Tacoma, in the County of Pierce. State of Washington. No office of the association shall be moved from its immediate vicinity except as may be provided in regulations made by the Federal Home Loan Bank Board."

It further appears that Loan Association has been given authority by the Federal Home Loan Bank Board to establish and does maintain branch offices in the Washington cities of Seattle and Bellingham, and the Oregon cities of Portland and Eugene.

To illustrate the fact that Loan Associations, like all federal savings and loan associations, are completely federal in nature, see People of State of Cal. v. Coast Federal Sav. & Loan Ass'n, D.C., 98 F.Supp. 311 at page 319, wherein it is stated:

"(24, 25) As stated in Eddy v. Home Federal Sav. & Loan Ass'n, 60 Cal.App.2d 42, 140 P.2d 156, 158: 'Further, a building and loan association organized under the Home Owners Loan Act is not a national bank and the powers and duties of the two materially differ.' As to national banks, Congress expressly left open a field for state regulation and the application of state laws; but as to federal savings and loan associations, Congress made plenary, preemptive delegation to the Board to organize, incorporate, supervise and regulate, leaving no field for state supervision."

See also Federal Savings & Loan Ins. Corp. v. Kearney Trust Co., 8 Cir., 151 F.2d 720.

■ It is not the purpose of the foregoing to intimate that this Court holds that it would have jurisdiction on the grounds of a "federal question" as distinguished from a grounds of "diversity of citizenship." It is suggested, however, that in view of the complete federalization of Loan Association that an open question on that phase is always presented, and it must be borne in mind that by reason of the complete federalization of Loan Association it is immune from any type of control or regulation by state authority, either by its state of localization or the State of Oregon wherein it maintains branch offices.

Mary urges as the sole ground for this Court's jurisdiction that of a diversity of citizenship, and the Court will content itself to dispose of the question on that ground alone.

As we all know, prior to the statute of February 13, 1925, now Title 28, U.S.C.A. § 1349, this Court could have had jurisdiction of Loan Association on the very ground of its federal incorporation. However, Section 1349 provides:

"The district courts shall not have jurisdiction of any civil action by or against any corporation upon the ground that it was incorporated by or under an Act of Congress, unless the United States is the owner of more than one-half of its capital stock."

It was stipulated of record at the opening of the trial that the United States is not the owner of more than one-half of the capital stock of Loan Association. Therefore, it is incumbent upon us to base jurisdiction, if any, in this case, upon a ground other and different from the mere fact that Loan Association was "Incorporated by or under an Act of Congress."

The phrase in the Act, "upon the ground," means upon the *sole* ground. See Patterson v. American Nat. Red Cross, D.C., 101 F.Supp. 655, on page 656, wherein the Court says:

"Title 28 U.S.C.A. § 1349, relied upon by the plaintiffs, in the opinion of the Court, is not applicable to this particular situation, as defendant does not take the position that this Court has jurisdiction 'upon the ground that it was incorporated by or under an Act of Congress.' It is only where this is the sole ground of jurisdiction that the United States must be the owner of more than one-half of its capital stock. The basis of alleged jurisdiction in this case is diversity of citizenship and not the fact that the defendant was incorporated 'by and under an Act of Congress.'"

This is the identical position urged by the plaintiff in this case as a basis for the court's jurisdiction and urges further, that unlike federal corporations authorized to transact business in several states, Loan Association is, under the basic law as well as its charter, localized within the single state of the State of Washington.

■ It appears to be now well established that a federal corporation which is organized to do business in several states is not a citizen of the state in which its principal office is located or of any other state within which it engages in its business. Federal Intermediate Credit Bank v. Mitchell, 277 U.S. 213, 48

S.Ct. 449, 72 L.Ed. 854; Bankers' Trust Co. v. Texas & P. R. Co., 241 U.S. 295, 36 S.Ct. 569, 60 L.Ed. 1010; First Carolinas Joint Stock Land Bank v. New York Title & Mortgage Co., D.C.S.C., 59 F.2d 350; Fisher & Van Gilder v. First Trust Joint Stock Land Bank, 210 Iowa 531, 231 N.W. 671, 69 A.L.R. 1340.

The concept of these cases is well stated in the following language, appearing in First Carolinas Joint Stock Land Bank of Columbia v. New York Title & Mortgage Co.:

> "Of course it is conceded by all that the citizenship of a corporation organized under an act of Congress does not make the corporation a citizen of any state. The general rule undoubtedly is that the citizenship of a federal corporation created to operate in one or more states is national only. Such a corporation has no state citizenship for jurisdictional purposes unless Congress so enacts."

It is important to note that in each of these cases the Court was dealing with a federal corporation authorized to transact its business in *several* states as distinguished from a federal corporation localized to a single state.

The rationale of citizenship by reason of localization is well presented in Orange Nat. Bank v. Traver, C.C.1881, 7 F. 146, 149, cited in 88 A.L.R. pp. 875–876. The Court, speaking of a plaintiff, national bank, organized under an Act of Congress, said:

> "Strictly speaking, then, the plaintiff is a citizen of the United States, but not of any state. Still, the plaintiff, though organized under a law of the United States, is by such organization and law 'located' in the state of Massachusetts, and by a parity of reasoning its stockholders may be presumed to be citizens of said state, and the corporation be entitled to sue and be sued as a citizen of Massachusetts."

See also, to the same general effect, Manufacturers' Nat. Bank v. Baack, C.C. 1871, 16 Fed.Cas. page 671, No. 9052.

Thus we find that it was apparently established federal law that a national bank was a citizen of the state in which it was located for jurisdictional purposes all prior to the Acts of Congress specifically permitting national banks to sue by virtue of their federal incorporation and the present enactment of Congress expressly making national banks citizens of their state of location for jurisdictional purposes. Title 28, § 1348, U.S.C.A.

Therefore, we are immediately confronted with the task of ascertaining the intent of Congress in its enactment of Section 1348. The annotators and editors of the article in 88 A.L.R. p. 874, have this comment with reference to Section 1348:

> "From this express statutory provision with respect to national banking associations, it may conceivably be inferred that Congress intended by exclusion to deny to Federal corporations other than national banking associations the attribute of state citizenship for the purposes of the jurisdiction of the Federal courts.
>
> "Such an inference may possibly be, and is, justified with respect to Federal banks other than national banking associations, on the theory of a logical implied exclusion of some members of a class, arising from the express inclusion in the statute of other members of the same general class."

and, further:

> "On the other hand, it may fairly be contended that Congress, in making national banking associations citizens of the states in which they are respectively located, far from evincing an intention to deny to Federal corporations other than national banking associations state citizenship, evinced the policy that a corporation localized in any particular state shall be regarded as a citizen of that state; and that therefore, where by its Federal charter a corporation has its domicil fixed in any particular state, it may be re-

garded as a citizen of that state for the purpose of jurisdiction of Federal courts on the ground of diverse citizenship."

This Court feels that it can be reasonably said that Section 1348, supra, is merely a codification of the Federal common law as established by Orange Nat. Bank v. Traver, and Manufacturers' Nat. Bank v. Baack, supra.

The existence of a "Federal common law" within the framework of American jurisprudence in the opinion of this Court is without question. Federal Savings & Loan Ins. Corp. v. Kearney Trust Co., 8 Cir., 151 F.2d 720, supra; Kaufman v. Western Union Telegraph Co., 5 Cir., 224 F.2d 723.

■ Therefore, this Court is of the opinion that Congress by its adoption of either Section 1348 or 1349, aforesaid, did not intend to abolish the said common law to the effect that a Federal corporation localized within one single state is a citizen of that state for jurisdictional purposes, and, furthermore concludes that this Court has jurisdiction by reason of diversity of citizenship between Mary and Loan Association.

### Effect of Taking Title as Tenants by the Entirety of the Timber Lands Purchased with Funds of the Co-partnership

It conclusively appears that since the latter part of 1926, the "co-partnership business now known as Tualatin Valley Nursery was operated as a partnership enterprise of Leo and Mary. With little or nothing to start with and by dint of their hard labor they eventually made their nursery a sizable institution in terms of assets and profits."

As stated, the object of the co-partnership was that of a general nursery business so common and well known in Western Oregon. It is bizarre to think or to urge that the purchase, owning and selling of the Western Oregon timber lands of the value involved herein, is incidental to such a general nursery business.

As stated before, accumulated funds in the account of the nursery business were utilized in purchasing the timber lands.

The uniform partnership law applicable in Oregon under ORS 68.130(2), provides:

"Unless the contrary intention appears, property acquired with partnership funds is partnership property."

This Court is of the opinion that the aforesaid portion of the uniform partnership Act is merely a codification of the general law which provides:

"The fact that realty was purchased with partnership funds does not alone establish firm ownership".

"There may be a purchase of property with firm funds to be held by partners as individuals, if this is the intention, such a transaction being merely a withdrawal by agreement of part of the common stock, and, if it appears that the real estate was acquired by a partner, as his individual property, and the firm funds used by him in purchasing it were charged to his individual account with the assent of his partners, such real estate will not be regarded as partnership assets. Payment for realty with money borrowed from the firm does not necessarily make the land partnership property.

"Whether realty purchased with firm funds is individual or partnership property is a *question of fact*, [emphasis ours] depending upon the intention of the parties, as revealed by

"The use made of the property,

"The conduct of the parties,

"Their agreements express or implied,

"The manner of keeping accounts,

"The payment of expenses connected with ownership,

"The disposition made of any income from the property, and

"All of the surrounding circumstances, the decision of each case

necessarily depending upon its own peculiar facts." 68 C.J.S., Partnership, § 72, pp. 509–510.

Applying the facts of this case to the foregoing tests we find:

Use made of the property:

No partnership use whatsoever, merely the holding of timber lands for profit and eventually sold.

Conduct of the parties and their agreements, express or implied:

Through, if not expressed, at least an implied, agreement between themselves, the title to the timber lands was taken by Leo and Mary, husband and wife, as tenants by the entirety as distinguished from tenants in co-partnership, of the Tualatin Valley Nursery. Even a layman in Oregon knows the well-known incidences of a title as tenants by the entirety as distinguished from the incidences of title in co-partnership. Leo and Mary executed the executory contract of sale for the timber lands and the subsequent deed conveying the same as husband and wife as tenants by the entirety, as distinguished from tenants in co-partnership of the Tualatin Valley Nursery.

The manner of keeping accounts:

There is no showing that either of the co-partners was actually charged upon the books or records of the co-partnership with the withdrawal of profits or capital on account of the purchase of the timber lands. However, the partnership income tax returns placed in evidence do not list the timber lands as co-partnership property, nor was there any report of the sale of said timber land and the resulting capital gains therefrom upon the books of account of the co-partnership or said income tax returns.

The disposition made of any income (sales price):

The initial down payment upon the contract, in the sum of $27,592.98, and the proceeds of the check therefor, made payable to Leo, was deposited in the Tigard Branch of the U. S. National Bank on or about February 25, 1948, in an account designated as Leo and Mary Elwert "Real estate account," as contra to any account belonging to the Tualatin Valley Nursery for the co-partnership. None of the proceeds of the remaining six installments of purchase price ever reached any account of the Tualatin Valley Nursery or said co-partnership, nor did the business of said co-partnership ever receive the benefit of any part of said purchase. The foregoing recital of facts reveals the interesting destination of three of said checks.

This Court is of the opinion that the foregoing "surrounding circumstances" conclusively show that Leo intended a distribution of co-partnership funds to himself and Mary as tenants by the entirety with its incidences as distinguished from that of a pre-existing tenancy in co-partnership, all, if not expressly, impliedly agreed to by Mary.

Therefore, the Court concludes the character and ownership of the proceeds from the sale of said timber lands is governed by the law of estates by the entirety between husband and wife, as distinguished from tenancy in co-partnership.

Effect of Executory Contract of Sale of the Timber Lands and Execution Thereof upon the Estate by the Entirety

It is unquestionably the law in Oregon that where an executory contract for the sale of real property is entered into, in equity the vendor is treated as owning personalty and the vendee is treated as owning realty, and as appears from the following statement of the Court, in City of Reedsport v. Hubbard, 202 Or. 370 at page 390, 274 P.2d 248 at page 257:

"Under an executory contract for the sale and purchase of land the vendee is treated in all respects as the owner of the property, although he has an equitable estate only. *Until the contract is fully performed* and the vendee is entitled to a conveyance of the legal title, the vendor retains the legal title simply as se-

**404**

curity for performance by the vendee." (Emphasis ours.)

It follows, therefore, so long as the contract involved herein remained executory the fee-simple title of the timber lands was vested in Leo and Mary, as tenants by the entirety with its full incidence of survivorship. In support of this conclusion the third-party defendant cites 41 C.J.S., Husband and Wife, § 34, pp. 461 and 467:

"An estate by the entirety cannot be severed or divided into two interests by the act of one of the spouses. It may, however, be destroyed or terminated by the joint acts of husband and wife, such as a sale and conveyance by both, although a contract for the sale of the land will not have this result. * * *

"By entering into the executory contract, the husband and wife do not thereby divest themselves of the right of survivorship and on the death of one spouse, the survivor becomes entitled to the unpaid portion of the purchase price."

and this Court cites the decision in United States v. Porter, U. S. District Court of Oregon, Civil Case No. 508, Judge McColloch, now Chief Judge (1941).

However, the foregoing cited doctrine and holding is not applicable to the case at hand. The once executory contract of sale has been completely executed and upon the receipt by Leo of the three subject installments of purchase price the contract became fully executed as to the same. This Court is of the opinion that when Leo received the payment of the three subject installments of purchase price he came into possession of personal property of which he was the owner of an undivided one-half interest and Mary was the owner of an undivided one-half interest.

For authority, see Ganoe v. Ohmart, 121 Or. 116 at page 125, 254 P. 203 at page 206:

" * * * the rents and profits of land owned by the entirety, being personal property, is the common property of the husband and wife, each owning one-half thereof."

Also Marchand v. Marchand, 137 Or. 444, at page 449, 3 P.2d 128 at page 130:

"While an estate by the entirety exists the husband and wife have an equal interest, and when they voluntarily join in its disposal the net proceeds thereof should be equally divided."

Therefore, the Court concludes that Mary was the legal owner of an undivided one-half interest in and to the proceeds of the said three subject checks.

This brings to our attention the contention of Loan Association that Leo had actual authority, or at least implied authority to endorse the subject checks. It appears from the evidence that at no time did Leo represent to Loan Association that he had endorsed Mary's name or acted in Mary's behalf as an agent. A mere examination of the checks plainly shows a purported genuine signature of Mary as distinguished from an endorsement by an agent. Furthermore, the fact of possession of the three checks by Leo raised no presumption of complete authority and dominion over the checks. The Court, in Hoffman v. First Nat. Bank of Chicago, 299 Ill.App. 290, 20 N.E.2d 121 at page 123, wherein an ex-husband, being the joint payee with his ex-wife caused a check with his endorsement and the forged endorsement of his ex-wife, to be cashed and collected by a collecting bank said:

"Therefore, he held the check for himself and the other payee. Upon a like question, as to the effect of the receipt of a note payable to a joint payee, the Supreme Court in the case of Ryhiner v. Feickert, 92 Ill. 305, 34 Am.Rep. 130 said: 'In all cases where notes are payable to joint payees, instead of partners, the actual manual possession of the notes must be in some one of the payees. It is impossible that it can be in all at the same time. The faces of these notes disclose the inter-

est of the holder—that he is joint payee, and that therefore he holds for himself and for all the other payees—and rebut any presumption that might arise otherwise from the mere possession of the notes.' "

The contention is untenable.

■ Also the contention of the defendant of a ratification of the endorsement and an estoppel against Mary because of Mary's failure to notify is fully answered by the conclusive facts of the case. Suffice to say that no person can ratify the act of another person when he has never had any knowledge of the act. The equitable doctrine of estoppel was developed to prevent a fraud or a wrong not to work a wrong.

### Question of Liability of Loan Association as the Cashing or Collecting Bank

■ It is unquestioned that a collecting (or a cashing) bank is liable in an action for conversion to the rightful owner of a check upon that bank's acceptance and payment to an unauthorized person of the proceeds of a check payable to a named payee whose endorsement is forged.

For a classical explanation of the reason for this rule see Good Roads Machinery Co. v. Broadway Bank, Mo.App., 267 S.W. 40, wherein the plaintiff was suing the collecting bank in conversion for payment over the unauthorized endorsement of plaintiff's name. At page 42 of 267 S.W., the Court said:

"The testimony shows conclusively that there is no contractual relation between plaintiff and defendant. Therefore this action is ex delicto and not ex contractu. The defendant bank has not contracted to pay plaintiff the amount of the check in controversy, but it has wrongfully intermeddled with it to the exclusion of, and disregard for, the rights of the owner, and that constitutes conversion. The term conversion has been defined as 'any distinct act of dominion wrongfully exerted over one's property, in denial

of his right, or inconsistent with it.' [citing authority.]

"As understood in this definition personal property includes choses in action such as notes, bills, checks, and other representatives of value, for a representative of value is itself a thing of value. * * * *The measure of damages is prima facie the face value of the paper converted.* (Emphasis ours.)

See also Williams v. International Harvester Co., 172 Or. 270, 141 P.2d 837; Siverson v. Clanton, 88 Or. 261, 170 P. 933, 171 P. 1051; and Zollman on Banks and Banking, Per.Ed.Vol. 6, at Sec. 4252.

■ So it follows that a collecting bank is likewise liable to a co-owner of a check upon that bank's acceptance and payment to an unauthorized person of the proceeds of the check upon such co-owner's forged endorsement. ORS 71.-041, provides:

"Indorsement of instrument payable to two or more persons. Where an instrument is payable to the order of two or more payees or indorsees who are not partners, all must indorse, unless the one indorsing has the authority to indorse for the others."

This section of the Negotiable Instrument Act was construed in support of the above conclusion in Crahe v. Mercantile Trust & Savings Bank, 295 Ill. 375, 129 N.E. 120, 12 A.L.R. 92, and cited as basic law in Hoffman v. First Nat. Bank of Chicago, supra; wherein the jurist held, 20 N.E.2d at page 124:

"So that, in the instant case the bank is liable to the payee for a share in the proceeds of the check which was drawn to the order of the plaintiff and her ex-husband, and upon which her name was forged."

■ Therefore, it is concluded that Loan Association converted to its own account and use the interest and ownership of Mary in each of the three subject-checks, being an undivided one-half interest therein, and is liable to Mary for

one-half of the face value of each of said three checks.

Question of Liability of Drawee Bank

ORS 71.189, provides:

"Check not an assignment of funds; liability of bank. A check of itself does not operate as an assignment of any part of the funds to the credit of the drawer with the bank, and the bank is not liable to the holder unless and until it accepts or certifies to the check."

It is apparent that ultimate payment of the three subject checks by the Drawee Bank was based upon its contractual obligation to Dant and Russell, Inc., the drawer of the checks. We need not go forward from the decision in the case of Bank of Republic v. Millard, 10 Wall. 152, 19 L.Ed. 897, referred to in First National Bank of Washington v. Whitman, 94 U.S. 343, 24 L.Ed. 229, wherein the Court held:

"The question is this: Can the payee of a check, whose indorsement has been forged or made without authority, and when payment has been made by the bank on which it was drawn, upon such unauthorized indorsement, maintain a suit against the bank to recover the amount of the check? We think it is clear, both upon principle and authority, that the payee of a check unaccepted cannot maintain an action against it against the bank on which it is drawn. The careful and well-reasoned opinion of Mr. Justice Davis in delivering the judgment of this court in Bank of the Republic v. Millard, 10 Wall. 152, [19 L.Ed. 897,] leaves little to add upon this subject by way of illustration or authority. In that case a paymaster of the army made his check on the Bank of the Republic to the order of Captain Millard for $859, due to him for arrears of pay as an officer of the army. The bank paid the amount of the check upon a forged indorsement of Millard's name. Recovering the check and exposing the forgery, Millard demanded payment to himself, and upon refusal, brought his action against the bank. This court held that the action could not be maintained, upon the principle that there was no privity between the bank and Millard. The bank's contract was with the paymaster only, and to him only was its duty. It received no money from Millard. It never promised Millard to pay him any money. It had no money belonging to him. It received money from the paymaster, upon an agreement that it would return it to him when called for by him in person, or that it would pay it upon his checks. But it made no such agreement, or any agreement, with Millard. For a failure of duty in this respect it was responsible to the paymaster, with whom it made the contract, and to no one else. If the check was not paid, the arrears of pay to Millard were not paid and his claim upon the government or the paymaster was not impaired by the giving of the check, which, being presented in due time, was not paid. He was still entitled to demand his arrears."

"It is further contended that such an acceptance of the check as creates a privity between the payee and the bank is established by the payment of the amount of this check in the manner described. This argument is based upon the erroneous assumption that the bank has paid this check. If this were true, it would have discharged all of its duty, and there would be an end of the claim against it. The bank supposed that it had paid the check; but this was an error. The money it paid was upon a pretended and not a real indorsement of the name of the payee. The real indorsement of the payee was as necessary to a valid payment as the real signature of the drawer; and in law the check remains unpaid. Its pretended payment did not diminish the funds of

the drawer in the bank, or put money in the pocket of the person entitled to the payment. The state of the account was the same after the pretended payment as it was before.

"We cannot recognize the argument that a payment of the amount of a check or sight draft under such circumstances amounts to an acceptance, creating a privity of contract with the real owner. It is difficult to construe a payment as an acceptance under any circumstances. The two things are essentially different. One is a promise to perform an act, the other an actual performance. A banker or an individual may be ready to make actual payment of a check or draft when presented, while unwilling to make a promise to pay at a future time. Many, on the other hand, are more ready to promise to pay than to meet the promise when required. The difference between the transactions is essential and inherent.

"Without discussing the other questions argued, we are of the opinion, for the reasons given, that the plaintiff below was not entitled to recover."

Therefore, this Court concludes that the Drawee Bank is not liable in any sense to the plaintiff herein.

From the foregoing the Court must finally conclude that the plaintiff is entitled to a judgment against Loan Association for the sum of $3,643.75, together with interest thereon at the rate of six per cent per annum from February 25, 1949; and the further sum of $3,506.25, together with interest thereon at the rate of six per cent per annum from August 23, 1949; and the further sum of $3,506.25, together with interest thereon at the rate of six per cent per annum from March 7, 1950; and together with her costs;

Further, the defendant, Drawee Bank, is entitled to a judgment in its favor against the plaintiff for its costs;

Further, the Loan Association is entitled to a judgment against the third-party defendant for the sum of $3,643.75, together with interest thereon at the rate of six per cent per annum from February 25, 1949, and the further sum of $3,506.25, together with interest thereon at the rate of six per cent per annum from August 23, 1949, and the further sum of $3,506.25, together with interest thereon at the rate of six per cent per annum from March 7, 1950, and for its costs.

Counsel for the plaintiff is requested to draw and submit general findings of fact and judgment orders in conformity with this opinion.