The CONJUGAL SOCIETY composed of Pedro Juvenal Rosa and Rosario Amador De Rosa; Pedro Juvenal Rosa and Rosario Amador De Rosa, Individually, Plaintiffs,

v.

CHICAGO TITLE INSURANCE COMPANY and First Federal Savings & Loan Association of Puerto Rico, Defendants.

Civ. No. 79-20.

United States District Court, D. Puerto Rico.

Jan. 4, 1979.

42

Harry R. Segarra, Santurce, P. R., for plaintiffs.

Ramírez, Segal & Látimer, San Juan, P. R., for First Federal Savings.

McConnell, Valdés, Kelley, Sifre, Griggs & Ruíz–Suria, Hato Rey, P. R., for Chicago Title.

## OPINION AND ORDER

PEREZ–GIMENEZ, District Judge.

The jurisdictional question before us arises from an action against Chicago Title Insurance Company (Chicago Title) and First Federal Savings and Loan Association of Puerto Rico (First Federal). Plaintiffs allege that they were the owners of a certain parcel of land within the municipality of Guaynabo, Puerto Rico, which they sold to Torre de Caparra Corporation for a cer-

tain sum of which they received part and on the remaining debt there was constituted a first mortgage in favor of plaintiffs. Two further mortgages were constituted by Torre de Caparra Corporation, one in favor of Continental Mortgage Investors and the other in favor of codefendant Chicago Title. The mortgage in favor of Chicago Title was to guarantee, among other things, obligations assumed by Chicago Title, whereby it would finish the apartment building in the event that Torre de Caparra Corporation was unable to do so. In exchange for the mortgage constituted in its favor and as a reciprocal obligation, the codefendant Chicago Title issued a performance bond, which contained a third party beneficiary clause in favor of plaintiffs whereby it guaranteed to the plaintiffs collection of its mortgage credits. Upon the representations of the guarantees by Chicago Title, the plaintiffs subordinated their first mortgage to that of Chicago Title. Codefendant First Federal entered into a refinancing agreement loan with Torre de Caparra Corporation, but as a condition First Federal obtained of the plaintiffs the further subordination of the first mortgage originally held by plaintiff. Subsequently, Chicago Title cancelled the performance bond. Thereafter, the apartment building was not completed, and codefendant First Federal executed its mortgage and acquired for itself the land property. Plaintiffs claim that as a result of a plan to defraud on the part of the defendants, the plaintiffs were deprived of their mortgage credits in the amount of $111,500.00, plus interest, and have suffered losses in the amount of $500,-000.00.

The jurisdictional grounds of the complaint filed in this case on January 4, 1979, were:

(a) 12 U.S.C., Sections 1464, et seq., and 28 U.S.C., Sections 1337; and

(b) 28 U.S.C., Section 1332.

Sections 1464, et seq., of Title 12, U.S.C., known as the Home Owners' Loan Act of 1933, as subsequently amended, authorize the establishment of Federal Savings and Loan Associations such as codefendant First Federal. Section 1337 of the Judicial Code grants jurisdiction to the District Court in a civil action "arising under any Act of Congress regulating commerce . . .". The other jurisdictional ground invoked by plaintiffs is diversity of citizenship.

On March 27, 1979, codefendant Chicago filed a motion to dismiss for lack of jurisdiction over the subject matter alleging that jurisdiction cannot attach over civil actions by or against a Federal Savings and Loan Association on the sole ground of its Federal incorporation and since plaintiffs do not allege any violation of the provisions of the Home Owners Loan Act nor claim any rights under it or under any other Act of Congress, their jurisdictional claim is actually on the sole ground of codefendant's federal incorporation. As to diversity, Chicago Title contends that codefendant First Federal is located in Puerto Rico for diversity of citizenship purposes having its home office in San Juan, Puerto Rico, thereby defeating complete diversity with plaintiffs who are also citizens of Puerto Rico.

On March 29, 1979, codefendant First Federal joined Chicago Title in the dismissal request. On April 2, 1979, plaintiffs filed a motion and memorandum in opposition to the motion to dismiss and thereafter both defendants and plaintiffs submitted additional legal memoranda on the jurisdictional issues.

On May 3, 1979, plaintiffs moved this Court for leave to file an amended complaint so as to allege an additional jurisdictional ground: 12 U.S.C. § 632. Leave was granted and plaintiffs' amended complaint accepted. Chicago Title responded with supplementary motions to its motion to dismiss alleging that by its own terms said statute is not applicable to Puerto Rico and that therefore it is unavailing to plaintiffs' claim of jurisdiction. First Federal's position varied in that it did not question the applicability of Section 632,[1] only arguing

---

1. In fact, First Federal has taken an active position in defending the applicability of Section 632 inasmuch as it has filed with this Court other cases as plaintiff under said section.

that plaintiffs' claim does not arise from a "banking transaction" within the meaning of Section 632. Thereafter, plaintiffs were allowed to conduct discovery on all the jurisdictional issues raised by the motion to dismiss and eventually filed an additional memorandum of law on the applicability of said statute in Puerto Rico and on the issue of "banking transaction". Both defendants subsequently filed memoranda in reply.

## II.

■ The issue raised by defendants' motions to dismiss as to plaintiffs' first jurisdictional ground is whether plaintiffs' action arises or not under an act regulating commerce under 28 U.S.C. § 1337. In this regard plaintiffs' contention is that their action arises under the Home Owners' Loan Act, 12 U.S.C. § 1464, et seq.

From the face of the complaint it is completely clear that plaintiffs' action does not arise under the Home Owners' Loan Act, nor under any other Act of Congress regulating commerce. Plaintiffs do not claim any right conferred by said Act, nor do they allege any facts that could be considered a violation of any of its provisions or of any other federal statute. In fact, the complaint has nothing to do with federal questions, and hence, there is no need to apply or interpret a federal law in order to decide the merits of this case. The resolution of the case on the merits is really contingent upon a matter of purely local law. Therefore, this Court's purported jurisdiction under 12 U.S.C. § 1464, et seq., and 28 U.S.C. § 1337 may rest solely upon the fact that codefendant First Federal was organized under or pursuant to an Act of Congress.

It is then evident that plaintiffs' first jurisdictional ground must fall since 28 U.S.C. § 1349 expressly forbids jurisdiction being attached on the sole ground of federal incorporation:

> "The district courts shall not have jurisdiction of any civil action by or against any corporation upon the ground that it was incorporated by or under an Act of Congress, unless the United States is the

owner of more than one–half of its capital stock."

*Fields v. Community Federal Savings & Loan Association*, 37 F.Supp. 367 (D.C.Miss., 1941), was apparently the first case to interpret the predecessor of Section 1349 (Title 28, U.S.C. 1940 Ed., Sec. 42, which was substantially identical to present Section 1349) as it applies to Federal Savings & Loan Associations. Therein the Court considered a suit against a Federal Savings & Loan Association all of whose capital stock was owned by the U.S. Government (the exception in Section 1349), but in doing so the Court incidentally approached the jurisdictional question of federal corporations privately owned. The Court stated:

> "The effect of the Act of February 13, 1925, was not to legislate that a proceeding against a federal corporation does not arise under the laws of the United States. (Congress could not exercise judicial power and such a declaration would be an exercise of judicial powers), *but was only to remove from the jurisdiction of federal courts such cases arising under the laws of the United States as suits against federal corporations in which the government was not the owner of more than one–half of the capital stock.*
>
> " . . .
>
> "One of the defendants here is a corporation all of whose capital stock is owned by the government. A suit against that corporation, for whatever reason it is sued, is a suit arising under the laws of the United States under the decisions of the Supreme Court. The essence of those decisions is that such a suit arises under the laws of the United States, not because of the character of the suit nor the relief demanded in it, but merely because the defendant sued is a federal corporation. *While it is certainly quite plausible to argue that a suit on a contract against a federal corporation is not a suit arising under the laws of the United States since no right conferred by those laws is sought to be enforced and no defense under*

*those laws is sought to be avoided*, still the Supreme Court has said it is a suit arising under the laws of the United States and must determine the question so far as this Court is concerned." *Fields, supra*, at 367 and 368. (emphasis added).

Post *Fields, supra*, it has become quite clear that after the enactment of the statute of February 13, 1925, now Title 28, U.S.C., Section 1349, federal courts cannot acquire jurisdiction over civil actions by or against a loan association on the sole ground of its federal incorporation. See *Elwert v. Pacific First Federal Savings & Loan Association*, 138 F.Supp. 395 (D.C.Or. 1956); and *Mamber v. Second Federal Savings & Loan Association of Boston*, 275 F.Supp. 170 (D.C.Mass., 1967).

To support their jurisdictional claim, plaintiffs invoke *Goldman v. First Federal Savings & Loan Association of Wilmette*, 377 F.Supp. 883 (N.D.Ill., 1974); *Gibson v. First Federal Savings & Loan Association*, 347 F.Supp. 560 (E.D.Mich., S.D., 1972), and *Murphy v. Colonial Federal Savings & Loan Association*, 388 F.2d 609 (2 Cir. 1967).

In those three cases the courts held that there was jurisdiction over the subject matter for there were federal questions at issue. All of them, however, involved alleged violations of rights conferred by the Home Owners' Loan Act or the regulations enacted pursuant to it. In *Goldman, supra*, plaintiff asserted jurisdiction under 28 U.S.C. § 1337, alleging that certain regulations enacted by the Federal Home Loan Bank Board pursuant to the referred Act, which provided that "each borrower from Federal associations on a loan secured by a home or a combination of home and business property shall have the right to prepay their loans without penalty unless the loan contract makes express provision for a prepayment penalty", 12 C.F.R. 545.6–12(b), had been violated. In *Gibson, supra*, an action was brought against the Federal Savings & Loan Association by mortgagors who alleged that the effect of defendant's mortgage loan provisions was to collect in advance escrow moneys on an equivalent of ¹⁄₁₁th rate per month of estimated taxes, assessments, etc., in violation of the ¹⁄₁₂th rate per month provision of governing federal regulations. *Murphy, supra*, also involved a claim under a federal regulation. Therein the plaintiffs claimed that the federal association management's refusal to provide a dissident group with a list of persons eligible to vote for directorships violated certain regulations of the Home Loan Bank Board. At page 611, the court said: "Such an issue, which requires a fleshing out of the Board's regulations, is one of federal law."

Plaintiffs argue that *Murphy* is authority for their contention that 28 U.S.C. § 1349 is not applicable to this case. But in *Murphy* the federal incorporation of the loan association in question was not invoked as a basis for jurisdiction, but rather the body of the complaint itself alleged facts which clearly envisioned a possible violation of federal regulations. Hence, the resolution of the case on the merits necessarily involved federal questions. The situation is very different when, as in the case at bar, the *only ground* for invoking the court's jurisdiction is the fact that one of the parties to the lawsuit is a federally organized institution. To that respect the court in *Murphy* said:

"Although on a strictly literal approach, any controversy concerning the interpretation of a federal statute or regulation governing the internal affairs of a federal corporation could be said to be grounded upon federal incorporation, such cases were not at all the 'mischief and defect' at which the statute, Sec. 12 of the Judges' Bill of 1925, 43 Stat. 936, 941, was aimed. The purpose rather was to stem 'the flood of litigation to which the federal courts were ... subjected' as a result of the decision in *Pacific Railroad Removal Cases*, 115 U.S. 1, 5 S.Ct. 1113, 29 L.Ed. 319 (1885), that every action by or against a federal corporation presented a federal question ... by generalizing the earlier legislation, 38 Stat. 803 (1915), which had prohibited railway corporations from resorting to the federal courts because of a federal charter. As Mr. Justice Van Devanter explained to the Senate Judiciary

Committee, *the bill extended 'the railroad section so as to cover any kind of federal corporation. If there happens to be some other ground for taking the case into a federal court, it can go there. But federal incorporation alone is not enough.'* Frankfurter & Landis, *The Business of the Supreme Court*, 272–273, fn. 55 (1927)". *Murphy, supra,* at 611 and 612. (emphasis added)

Obviously, *Murphy* is no authority for plaintiffs' jurisdictional ground. On the contrary, said opinion does in fact recognize the real purpose of Section 1349, which is to limit cases that are brought into federal court because one of the parties is a federally chartered institution.

In the case at bar plaintiffs do not state in their complaint that the United States is the owner of more than one–half of the capital stock of codefendant First Federal. Nor do they allege violations of federal statutes or regulations. The character of plaintiffs' action has nothing to do with federal law, except for the sole fact that First Federal is a federally organized association. Therefore, the body of the complaint fails to state facts showing that the case does in fact arise under an act regulating commerce.

### III.

■ The second jurisdictional ground advanced by plaintiffs in their complaint is diversity of citizenship. In this connection, Chicago Title contends that codefendant First Federal is a citizen of Puerto Rico for diversity of citizenship purposes and that therefore, there is no complete diversity with plaintiffs who are also citizens of Puerto Rico. We are in agreement.

The issue of how to determine the state of citizenship of a Federal Savings & Loan Association organized or created under the Home Owners' Act was approached in *Elwert v. Pacific First Federal Savings & Loan Association, supra,* in which one of the defendants was a Federal Savings & Loan Association organized under said Act with its home office in the state of Washington and a branch office in Portland, Oregon.

The case was filed in the Federal District Court of Oregon by a citizen of that same state, who invoked the jurisdiction of the court on the sole ground of diversity of citizenship. The loan association contended that the court lacked jurisdiction since it was also a citizen of the state of Oregon because of its branch in that state, thereby defeating diversity. The court rejected that argument and held *that the loan association was only a citizen of the state where it was located,* that is, where it kept its home office (in that case, the state of Washington), and that therefore, there was diversity between the parties. The court reasoned:

"It appears that pursuant to this authority (12 U.S.C.A. Sec. 1464), by resolution adopted dated March 8, 1937, the Home Owners' Loan Bank Board issued Loan Association's *charters,* and that Articles 1 and 2 thereof provide as follows:

.    .    .    .    .

"2. Office. The *home office* of the Association shall be located at Tacoma, in the County of Pierce, State of Washington . . . .

"It further appears that Loan Association has been given authority by the Federal Home Loan Bank Board to establish and thus maintain branch offices . . . .

.    .    .    .    .

"Therefore, this Court is of the opinion that Congress, by its adoption of either Section 1348 or 1349, aforesaid, did not intend to abolish the said common law to the effect that a *Federal corporation located within one single state is a citizen of that state for jurisdictional purposes,* and furthermore concludes that this court has jurisdiction by reason of diversity of citizenship between Mary (plaintiff) and Loan Association." *Elwert, supra,* at 399 and 402 (emphasis added).

See also Wright, *Law of Federal Courts,* Third Ed., pp. 101 and 102 and cases cited at note 11 of page 102.

■ In the case at bar the charter of codefendant First Federal, a copy of which

is attached to the transcript of the deposition of Mr. José A. Marrero, officer of such codefendant, shows that the home office of First Federal is located at San Juan, Puerto Rico, and that the charter was issued by the Home Owners' Loan Bank Board pursuant to the Home Owners' Loan Act of 1933. Therefore, codefendant First Federal is located within the single state of Puerto Rico for diversity of citizenship purposes. And since plaintiffs also allege in the complaint to be citizens of Puerto Rico, jurisdiction by reason of diversity cannot stand.

In fact, codefendant First Federal has not made any attempt to controvert said reasoning. Likewise, plaintiffs seem to have abandoned such jurisdictional ground in their opposition to the motion to dismiss and subsequent legal memoranda.

### IV.

Plaintiffs' last ground for invoking this Court's jurisdiction, as alleged for the first time in their amended complaint of May 3, 1979, is 12 U.S.C. § 632, which in its pertinent part provides:

"Notwithstanding any other provision of law, all suits of a civil nature at common law or in equity to which any corporation organized under the laws of the United States shall be a party, arising out of transactions involving international or foreign banking, or banking in a dependency or insular possession of the United States, or out of other international or foreign financial operations, either directly or through the agency, ownership, or control of branches or local institutions in dependencies or insular possessions of the United States or in foreign countries, shall be deemed to arise under the laws of the United States, and the district courts of the United States shall have original jurisdiction of all such suits . . . ."

Conceding without deciding that the complaint filed herein sets forth a claim arising out of a banking transaction, let's approach the square issue of whether the banking transaction arises "in a dependency or insular possession of the United States" within the meaning of Section 632 so as to grant this Court original jurisdiction.

In *Rosa Lugo Ríos v. First National City Bank*, Civil Case No. 76–322 (unreported opinion), this Court, through late Chief Judge Toledo, handed down an opinion on May 24, 1976, deciding that it lacked jurisdiction under Section 632 since banking transactions in the Commonwealth of Puerto Rico are not banking transactions "in a dependency or insular possession of the United States", within the meaning of Section 632. Said ruling was solely based on the fact that in 1959 Congress enacted Public Law 86–230 of which Section 14 (12 U.S.C. 42) provided:

"The provisions of all Acts of Congress relating to national banks shall apply in the several States, the District of Columbia, the several Territories and possessions of the United States, and the Commonwealth of Puerto Rico."

This Court after citing portions of the Senate Report on the purpose of Bill H.R. 8159, which originated Public Law 86–230, reasoned that it was evident Congress, when enacting said statute, ". . . considers that the Commonwealth of Puerto Rico is something *different* from a Territory or possession." *Rosa Lugo Ríos, supra*, at page 6.

Plaintiffs herein argue that Public Law 86–230 actually makes Section 632 applicable to Puerto Rico since the latter is an Act of Congress "relating to national banks". We find this argument redundant. By virtue of Section 9 of the Puerto Rican Federal Relations Act, not all laws of the United States are applicable in Puerto Rico; only those not locally inapplicable are. If plaintiffs' reasoning were to be sound, the federal courts of all the States and the District of Columbia could attach jurisdiction in an action arising under Section 632 by reason of the enactment of Public Law 86–230, which includes among its provisions "the several States" and "the District or Columbia". Obviously, Congress intended for all acts "relating to national banks", which would otherwise be applicable, to be extended to Puerto Rico, etc.

On August 25, 1976, late Chief Judge Toledo on reconsideration, issued a second (unreported) opinion in *Rosa Lugo Ríos, supra.* Defendant's first argument in its motion for reconsideration was that the Court's prior holding was against firmly established precedent. To this, the Court replied that the precise issue involved therein was not discussed at all in those so–called precedents, but rather they assume without more that jurisdiction lied under Section 632.[2]

The second argument raised on reconsideration by the defendant in *Rosa Lugo Ríos* was that Congress did not have to amend all pre–1952 federal statutes, after 1952, to substitute "Commonwealth of Puerto Rico" for "territory", "insular possession", etc.[3] This Court agreed with that reasoning, but added "that when Congress *does amend* said statutes, as in the case at bar, this Court cannot choose to ignore the change of language or consider it merely so: a change in language with no ultimate significance". *Rosa Lugo Ríos, supra*, at page 4.

The last two arguments made by the defendant in *Rosa Lugo Ríos* were to the effect that the Court's reading of Section 14 of Public Law 86–230 would have the effect of finding the whole Chapter 6 of the National Bank Act inapplicable to Puerto Rico and would deny deference to the regulations enacted by the Board of Governors of the Federal Reserve System in enforcing Chapter 6, interpreting "banking abroad", "foreign banking" and "banking in a foreign country" as including banking in the Commonwealth of Puerto Rico.[4] Late

Chief Judge Toledo declined to entertain these last two arguments since he found alternate grounds for jurisdiction as alleged by the defendant who was seeking removal. He did say, however, that defendant's last arguments were not flimsy, "(n)or we humbly feel, is our *dicta* in our previous *Order*." *Rosa Lugo Ríos, supra*, at page 5, note 1.

In *Piovanetti Pugals v. First National City Bank*, 440 F.Supp. 731 (D.C.P.R., 1977), Judge Pesquera immediately approached those last two arguments that the Court had declined to entertain in *Rosa Lugo Ríos, supra.* Judge Pesquera said:

"We find that these arguments are redundant. The purpose of Public Law 86–230 was to eliminate ambiguities by providing in section 14 that the provisions of *all* acts of Congress relating to national banks shall apply in the several States, the District of Columbia, the several territories and possessions of the United States *and* the Commonwealth of Puerto Rico. The ambiguity that existed was precisely as to the status of Puerto Rico, as it could not be classified as a foreign country nor as a dependency or insular possession. The ambiguity of the present political status of Puerto Rico certainly prevails, but as has been the trend, Puerto Rico was once more being considered at par with the District of Columbia and the several states, as it should be, given its common citizenship [1] and its advanced judicial system.[2]" *Piovanetti Pujals, supra*, at pages 731 and 732. (emphasis in the original) [5]

---

2. Among the cases considered by late Chief Judge Toledo was *Chase Manhattan Bank, N.A. v. Corporación Hotelera*, 516 F.2d 1047 (1 Cir. 1975), which codefendant First Federal advances in its latest memorandum as a binding precedent upon this Court. The only comment made by the Court of Appeals in that case was a footnote indicating: "The Court (referring to the District Court) had jurisdiction in the mortgage foreclosure action under the Banking Act of 1933, 12 U.S.C. 632." We do not feel constrained by such *dictum* for exactly the same reasons stated in *Rosa Lugo Ríos, supra.*

3. Plaintiffs also advance this proposition.

4. See 12 C.F.R. 211.1(a) and 213.2(b), 1978 edition.

5. The two footnotes in the opinion read as follows:
"(1) The rights, privileges and immunities of the citizens of the United States shall be respected in Puerto Rico to the same extent as though Puerto Rico were a State of the Union .... Sec. 2, The Puerto Rican Federal Relations Act;
"(2) In 1961, Public Law 87–189, Section 1258 of Title 28 was added to modify the previous procedure of appeal from the Supreme Court of Puerto Rico to the Court of Appeals for the First Circuit and to provide that final judgments and decrees entered by the Supreme Court of Puerto Rico shall be reviewed instead by the Supreme Court of the nation on *certiorari* or appeal in the same

Puerto Rico's relationship with the Unit- ed States is and has been rather unique, especially after the compact of 1952, and even today it is not yet clear whether it is or not a territory of the United States, and if so, what kind of territory. The federal courts, in some cases, have considered Puerto Rico as subject to the power of Congress under the Territory Clause of the Constitution, U.S.Const., Art. IV, Sec. 3, Cl. 2, and have upheld Congressional statutes enacted pursuant to such authority which treat Puerto Rico differently from the States. In other cases, however, the courts have upheld the validity of statutes which equate Puerto Rico to the States. Thus, the power of Congress to consider Puerto Rico as a territory, dependency or possession of the United States for purposes of one statute and as a state or something other than a territory, dependency or possession for purposes of another, does not appear to be questioned.[6] Cfr. *Mora v. Torres*, 113 F.Supp. 309 (D.C.P.R., 1953); *Mora v. Mejías*, 206 F.2d 377 (1 Cir., 1953); *United States v. Figueroa Ríos*, 140 F.Supp. 376 (D.C.P.R., 1956); *Fornaris v. Ridge Tool Co.*, 400 U.S. 41, 91 S.Ct. 156, 27 L.Ed.2d 174 (1970); *District of Columbia v. Carter*, 409 U.S. 418, 93 S.Ct. 602, 34 L.Ed.2d 613 (1973); *Calero Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 94 S.Ct. 2080, 40 L.Ed.2d 452 (1974); *Examining Board of Engineers, Architects and Surveyors v. Flores*, 426 U.S. 572, 96 S.Ct. 2264, 49 L.Ed.2d 65 (1976); *Califano v. Torres*, 435 U.S. 1, 98 S.Ct. 906, 55 L.Ed.2d 65 (1978); *Torres v. Puerto Rico*, 442 U.S. 465, 99 S.Ct. 2425, 61 L.Ed.2d 1 (1979); and *Harris v. Rosario*, — U.S. —, 100 S.Ct. 1929, 64 L.Ed.2d 587 (1980). See also *García Mercado v. Superior Court*, 99 P.R.R. 287 (1970); *RCA v. Government of the Capital*, 91 P.R.R. 404 (1964); and *Pagán v. Alcaide*, 102 D.P.R. 101 (1974).

Therefore, for purposes of the case at bar, the actual juridical status of the relationship of Puerto Rico with the United States is not at all crucial. The important issue is the intent of Congress when enacting Section 632 and subsequently Public Law 86–230; whether Congress intended to treat Puerto Rico as a territory or as something else. As we have seen, the intent of Congress in Public Law 86–230 was to clarify that for purposes of acts relating to national banks, including Section 632, Puerto Rico is to be considered as something different from a dependency or insular possession. Since Congress opted for such a treatment, we are naturally bound by it.

Perhaps the most serious question raised by plaintiffs herein and which was not discussed at length in *Piovanetti Pujals, supra*, is the deference which the aforementioned regulations[7] enacted by the Board of Governors of the Federal Reserve System (the Board) in enforcing Chapter 6 of the Banking Act of 1933, as subsequently amended, may be entitled to.[8]

manner as judgments from the highest courts of the several states of the Union are reviewed by that Court."

**6.** Whether Congress always legislates for Puerto Rico under the authority of the Territory Clause, is neither very clear; but as we shall see, this is not relevant for the solution of this case.

**7.** 12 C.F.R. 211.2(a) and 213.2(b), 1978 edition. These regulations were in force at the time of the filing of this action. Effective June 14, 1979, they were amended and renumbered and Section 211.2(f) now defines "foreign" or "foreign countries" as "one or more foreign nations, and includes the foreign Territories, dependencies, and insular possessions of those nations and of the United States, and the Commonwealth of Puerto Rico."

**8.** The interpretative character of said regulations as opposed to "legislative" regulations cannot be doubted and is not contested by plaintiffs nor codefendant First Federal. Hence, even if we found that they were applicable to 12 U.S.C. § 632, which we do not (see *infra*), this Court would not be constrained by their contents and could substitute judgment since courts have traditionally felt no deference for "interpretative" rules. See *Skidmore v. Swift & Co.*, 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944); *Addison v. Holly Hill Fruit Products, Inc.*, 322 U.S. 607, 64 S.Ct. 1215, 88 L.Ed. 1488 (1944); *Social Security Board v. Nierotko*, 337 U.S. 358, 66 S.Ct. 637, 90 L.Ed. 718 (1946).

**50**

These regulations were promulgated pursuant to the authority conferred to the Board by 12 U.S.C. §§ 248, 601–604a and 611–631 (see 12 C.F.R. 678, 1978 edition). It is our view that said interpretative regulations do not apply at all to 12 U.S.C. § 632 for various reasons.

The statutory scheme under which they were enacted originated in 1913 when Congress passed the Federal Reserve Act as Public Law No. 43 of December 23, 1913 (38 U.S.Stat. 251). Section 25 of the Federal Reserve Act, 38 U.S.Stat. 273, authorizes the establishment of foreign branches by national banks and investments in banks doing foreign business. Section 25 was later codified as Sections 601–604 of Title 12, U.S.C. which became the first part of Chapter 6 of the National Bank Act, dealing with foreign banking. On December 24, 1919, Congress enacted an Act to authorize the organization of corporations to do foreign banking, popularly known as "Edge corporations" (41 U.S.Stat. 378). This law was added to the Federal Reserve Act as Section 25(a), 41 U.S.Stat. 378, which became the second part of Chapter 6 as codified in 12 U.S.C. §§ 611–631. Thus, as of 1919 Chapter 6 of the National Bank Act dealing with foreign banking was made up of two parts; the first authorizing the creation of foreign branches by national banks and the second part dealing with Edge corporations.

It was not until June 16, 1933, that the jurisdictional provision involved herein came into being. This was through Public Law No. 66 known as the Banking Act of 1933, whose purpose was "to provide for the safer and more effective use of the assets of banks, to regulate interbank control, to prevent the undue diversion of funds into speculative operations, and for other purposes". 48 U.S.Stat. 162. Through Section 15 of said Act, 48 U.S.Stat. 184, Congress amended the Federal Reserve Act so as to add Section 25(b) which is the provision at issue codified as 12 U.S.C. § 632. This is how Section 632 came to be part of the Federal Reserve Act as we know it today.

The foregoing is important to understand why the aforementioned regulations of the Federal Reserve System have no bearing whatsoever on the meaning of "foreign banking", or "banking in a dependency or insular possession of the United States", within the meaning of Section 632. Actually, the Board attempted to define "banking abroad", "foreign banking" and "banking in a foreign country" as including banking in Puerto Rico only for purposes of Sections 601–631 of Title 12, U.S.C. and not for Section 632. In fact, Regulation 211.1 in force at the time of the filing of this action reads in its pertinent part as follows:

"(a) Authority and Scope. This Part is issued by the Board of Governors of the Federal Reserve System (the 'Board') under authority of the Federal Reserve Act (the 'Act'). It applies to corporations organized under Section 25(a) of the Act (12 U.S.C. 611–631). . . ." 12 C.F.R. at 678 (1978 edition) [9]

Therefore, the Board did not intend to define "transactions involving international or foreign banking" or "banking in a dependency or insular possession of the United States" as such terms are used in Section 632. Rather, its definitions are expressly limited to interpret the language of Sections 611–631 and for purposes other than defining the extension of the jurisdiction of federal courts. And it could not be otherwise since nowhere in the National Bank Act was the Board granted the authority to define the jurisdictional ambit of the federal courts to hear the kind of cases described in Section 632.

Furthermore, the Board's regulations apply only to corporations organized under Section 25 and 25(a) of the Federal Reserve Act. The "bank" involved herein is a Federal Savings and Loan Association organized under the Home Owners' Loan Act of 1933, as subsequently amended, 12 U.S.C. Sections 1461, et seq., not under the Federal Reserve Act, and its charter was issued by the Home Owners' Loan Bank Board. It is thus subject to the rules and regulations

**9.** The amended regulation propounds basically the same scope. See 12 C.F.R. 211.1.

adopted by such Board and not to the ones adopted by the Federal Reserve System's Board.

One more reason to hold that Congress did not intend to include Puerto Rico in Section 632 is that pursuant to the Constitution of the United States and to Section 2 of the Puerto Rican Federal Relations Act, the U. S. banks are afforded in Puerto Rico the same privileges and immunities as the local banks. Or, as stated by this Court in *Piovanetti Pujals, supra,* at 732:

> "... the reasons that may exist for the exclusive jurisdiction of federal courts in cases arising out of transactions involving international or foreign banking or banking in a dependency or insular possession of the United States, are not present when banking transactions occur in one of the several states or in Puerto Rico. In cases of foreign banking, the purpose is to guarantee the foreign party a real or presumed higher level of judicial consideration at the national level—and the application of a uniform 'federal common law' as compared with lower level state courts and the application of varied state law. In cases of banking in a dependency or insular possession the fear that the territorial courts may be prejudiced against the litigants from the 'metropolis' or lack of confidence in their judicial system."

As to plaintiffs' contention that Section 632 must be applicable to Puerto Rico since if not it "... would mean that the banks in Puerto Rico would suffer no federal regulation; operating at their whim and in a fancy to the possible prejudice of the public", we would like to point out that our holding today does not mean that the whole Chapter 6 of the National Bank Act is not applicable in Puerto Rico. We are just deciding that Section 632 is not applicable; that banking transactions carried out in Puerto Rico by corporations organized under the laws of the United States are not "banking in a dependency or insular possession of the United States", within the meaning of Section 632. For jurisdictional purposes under Section 632 transactions of national banks in Puerto Rico are on the same footing as transactions in the several States of the Union and the District of Columbia. We need not decide whether the other provisions of said Chapter 6 can be enforced or not in Puerto Rico since said issue is not before this Court.

In view of the foregoing, it is hereby ordered that this action be DISMISSED for lack of jurisdiction over the subject matter.

IT IS SO ORDERED.