**Helen P. DUDEN**

v.

**The UNITED STATES et al., Third-Party Defendants.**

**No. 293–69.**

United States Court of Claims.

Oct. 13, 1972.

Robert E. Nelson, Portland, Or., attorney of record for plaintiff.

Thomas Smidt, II, Arlington, Va., with whom was Asst. Atty. Gen. Scott P. Crampton, for defendant. Phillip R. Miller and Theodore D. Peyser, Jr., of counsel.

Terry W. Baker, Lake Oswego, Or., attorney of record for United States National Bank of Oregon.

Dean D. DeChaine, attorney of record for First National Bank of Oregon.

Before COWEN, Chief Judge, and DAVIS, SKELTON, NICHOLS, KASHIWA, KUNZIG and BENNETT, Judges.

## OPINION

PER CURIAM:

This case was referred to Trial Commissioner William E. Day with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Rule 134(h). The commissioner has done so in an opinion and report filed on June 7, 1972. No exceptions have been filed to the commissioner's opinion and report and the time for so filing pursuant to the Rules of the court has expired. On August 1, 1972, defendant filed a motion requesting that the court adopt the trial commissioner's recommended findings of fact and conclusion of law to which motion no response has been filed. Since the court agrees with the commissioner's opinion, findings of fact and recommended conclusion of law, as hereinafter set forth, it hereby grants defendant's said motion and adopts the same as the basis for its judgment in this case without oral argument. Therefore, plaintiff is not entitled to recover and her petition and the counterclaims of the third party defendants are dismissed.

## OPINION OF COMMISSIONER

DAY, Commissioner:

This is a suit involving a claim against the Check Forgery Insurance

Fund, 31 U.S.C. §§ 561–564 (1970)[1] and 31 C.F.R. §§ 359.0–359.4. An alternative claim is made under the provisions of 28 U.S.C. § 1346(a)(1), which covers jurisdiction over suits for refund of internal revenue taxes.

Three Treasury checks issued to Harold P. and Helen P. Duden covering the tentative allowance of loss carrybacks for their tax years 1959, 1960, and 1961 are the subject matter of the plaintiff's claims. Harold P. Duden is the plaintiff's former husband. It is undisputed that Harold P. Duden endorsed all three checks, signing his own and plaintiff's name to the checks, and thereafter negotiated them at the two third party banks.

The United States National Bank of Oregon, Portland, Oregon, and the First National Bank of Oregon, Portland, Oregon, were, by motion of the defendant, noticed into the case and have appeared. Each bank has entered a contingent counterclaim for judgment over, against Harold P. Duden. It is apparent from the motion for leave to serve notice upon an interested third party, that the defendant, if it is found liable to the plaintiff, would have the court enter a judgment over against the two named banks. It would appear that the proper course for the defendant would have been the issuance of a summons under Rule 41(e) rather than a notice under Rule 41(b). No question is raised by the parties as to this difference and the result will not be changed in view of the opinion and conclusion of law to follow.

Most of the facts have been stipulated. A trial has been held, however, and at the conclusion of the plaintiff's case-in-chief, First National Bank of Oregon made a motion (through counsel) under Rule 102(c) that the case be dismissed as to it since the endorsement on the Treasury check which Harold Duden deposited in its bank (the proceeds of which were later paid to Harold Duden) was specifically authorized by a joint account signature card signed by Helen Duden and Harold Duden (see finding 18). This motion was allowed. Thereupon, the defendant moved that the case be dismissed as to it insofar as the proceeds of the check for $11,934.92 (which involved First National Bank of Oregon) was concerned. This motion was likewise allowed, since according to the signature card referred to, Helen Duden had specifically authorized Harold Duden "to sign or endorse any and all checks * * * payable to the other * * *."

Plaintiff's former husband, Harold P. Duden, was the sole source of the family's income throughout the marriage. He was for many years in the business of receiving, storing and servicing newly imported automobiles in Portland, Oregon. Since 1949, Harold had been the president of one such business, Westland Warehouse. In 1957, its owners offered him a 51 percent controlling interest, which he bought. Two other men acquired the remaining 49 percent interest.

In 1960, Westland was acquired in an exchange of stock by Suburban Motors, a holding company which was also controlled by Harold. Suburban quickly acquired additional subsidiaries. Grad-

1. 31 U.S.C. § 562 provides as follows:
"Whenever it is established (a) that any check heretofore or hereafter drawn on the Treasurer of the United States has been lost or stolen, without the fault of the payee or a holder who is a special indorsee and whose indorsement is necessary to the further negotiation of such check, (b) that such check has thereafter been negotiated and paid by the Treasurer on a forged indorsement of the payee's or special indorsee's name, (c) that the payee or special indorsee has not participated either directly or indirectly in the proceeds of such negotiation or payment, and (d) that reclamation from the forger or transferees or parties on such check subsequent to the forgery has been or may be delayed or be unsuccessful, the Treasurer of the United States is authorized and directed to draw on the fund prior to reclamation to pay such payee or special indorsee the amount of such check, without interest."

ually, however, its financial condition began to suffer and in January 1962, its shareholders decided to dissolve the corporation. Harold (who had continued to operate Westland all during this time) was confident that it was still a profitable business and he acquired its assets from Suburban. As it turned out, however, Westland had become more debt-ridden during its ownership by Suburban than he suspected. Its operations had been expanded to include a commodity division which greatly drained off its profits from the automobile storage business.

Still hopeful of eventually making the business successful, Harold eliminated everything except the automobile functions. At this time, there were current accounts payable of approximately $30,-000 and other debts of nearly $200,000. Harold had been required to guarantee personally many of these debts to get financing for his promotions. Fearing that these creditors would start pressing him, he decided on a plan to divest himself of his personal assets. Although his personal advisors were opposed, Harold received the approval of two banks which held mortgages on the business. The maneuver was merely to buy time—Harold fully intended to repay all the creditors.

At the time of this decision, Harold had the following principal assets:

(a) The business (now renamed Columbia Warehouse) which he was operating as a sole proprietorship.

(b) A 50 percent interest in the so-called Steel Building, a warehouse he acquired in 1961 (along with his brother) for use in the business.

(c) A one-third interest in the rentals from the Rhodes Building, which was rented to a successful department store in Portland.

(d) A joint interest (with Helen) in their home.

(e) Certain stocks and bonds.

The first step in the plan was to begin depositing Columbia's business funds into Helen's personal checking account at the Citizens Bank of Oregon. Business disbursements were also made from this account.

In June 1962, Harold incorporated the business as Columbia Warehouse Company, issuing 70 percent of its stock to his wife and four children. The remaining 30-percent interest went to three of Harold's business advisors. Helen was designated as president of Columbia Warehouse Company, the corporation.

On June 22, 1963, he deeded his one-half interest in the Steel Building to Helen. At this time it was encumbered by first and second mortgages totaling $387,535.80. Harold continued to make these payments towards this indebtedness (in the sum of $566.68 per month) until they were taken over by Helen in March 1966.

In October 1962, he shifted his Columbia salary to Helen. Throughout this time, Harold continued to run the business.

In December 1962, Harold moved out of his house because he and Helen were having serious marital problems.

On their joint Federal income tax return for 1962, Harold and Helen claimed business bad debt losses of $167,000. Thereafter, on June 1, 1963, Helen signed an application for tentative carryback adjustment of a 1962 net operating loss amounting to $159,260.29 based on these bad debts. She executed the form perfunctorily and did not notice the amounts. The carrybacks provided for refunds of taxes paid with their previously filed joint income tax returns for 1959, 1960, and 1961. Harold himself signed the application form on June 4, at which time he changed the address on the form from Helen's home address to his office address at Columbia Warehouse. On June 21, notices were sent to Harold's office that the refunds had been granted and that checks would be forthcoming.

On June 24, 1963, three checks refunding taxes plus interest were issued to "Harold P. and Helen P. Duden" as follows:

(a) Treasury check No. 6,220,746 refunding $17,404.70 for 1959 (the first check).

(b) Treasury check No. 6,220,747 refunding $13,040.07 for 1960 (the second check).

(c) Treasury check No. 6,220,748 refunding $11,934.92 for 1961 (the third check).

These checks were received by Harold P. Duden.

The first check was endorsed by Harold (who also signed Helen's name to its back) and deposited in his commercial account at the United States National Bank of Oregon on July 2, 1963. On the same day, Harold drew a counter check from this account, payable to Lenora M. Knudsen (whom he later married) for $15,000, and she deposited this check into her savings account at the same bank. On September 9, 1963, Lenora M. Knudsen transferred the $15,000 to an account at the Bank of Hawaii in Honolulu, which account was controlled by Harold Duden. To prevent Helen's knowledge of this, Harold directed the United States National Bank of Oregon to send its monthly statements to his office address instead of to Helen's home address.

The second check was endorsed by Harold (who also signed Helen's name) and deposited to a trust account of W. F. Whitely at the United States National Bank of Oregon on July 2, 1963. On September 11, Mr. Whitely drew a check on the funds so deposited, payable to Harold P. Duden for $10,391.15. On September 17, 1963, this check was deposited by Harold to the aforementioned account at the Bank of Hawaii.

The third check was endorsed by Harold (in both his and his wife's name) and deposited to their joint checking account at the First National Bank of Oregon on July 2, 1963. On the same day, Harold had a cashier's check drawn on this joint account, in the amount of $11,000, payable to T. M Knudsen (Lenora M. Knudsen). On July 3, 1963, Lenora Knudsen deposited this check to her personal account at the First National Bank of Oregon. During the next three months, all of this money was spent at Harold's direction, although only $3,500 actually went to his bank account in Hawaii.

Of the total $42,379.69 refunded, Harold diverted to his own use $36,391.15.

The significance of these manipulations is brought out by the fact that Harold left Helen in August 1963 and went to Hawaii where he intended to establish another car storage and service business similar to Columbia. At about the time Harold left, Helen learned that he had received certain tax refunds, but evidently she did not know their amounts. Helen is not a business minded person and she paid little attention to Harold's business affairs. However, she was aware of the fact that he embarked on his plan to transfer all his assets out of his own name.

On September 17, 1963, Harold sent to Helen three cashier's checks drawn on his Hawaii account—one check was payable to Helen for $3,300 and the other two were payable to their children (Patricia and Paul) for $1,000 each.

On February 24, 1964, Harold transferred his interest in their home to Helen. Thereafter, Helen took over the mortgage payments from Harold.

The Hawaiian venture failed and Harold lost all his money. He returned to Portland in the summer of 1964.

Harold and Helen were divorced on November 29, 1965. After this divorce, Harold P. Duden married Lenora M. Knudsen.

On April 24, 1965, the Internal Revenue Service notified Helen that the tentative carryback adjustments for 1959, 1960, and 1961 were disallowed as constituting variously, contributions to capital and nonbusiness bad debts. Harold and Helen protested the disallowances and, following appellate division confer-

ences, the amount of the proposed deficiency for 1959 was reduced. On June 21, 1966, a statutory notice of deficiency was issued for the following tax liabilities:

| | |
|---|---|
| 1959 .................. | $1,867.97 |
| 1960 .................. | 12,681.35 |
| 1961 .................. | 11,606.60 |
| Total .............. | $26,155.92 |

These amounts, plus interest, were assessed against them on November 18, 1966. Levies were not made, however, until late in 1967 and 1968 when $2,842.-40 in salary due Helen from Columbia and her interest in the Steel Building were seized. On August 26, 1968, Helen paid $32,085.76 in full settlement of the remaining taxes and interest and the levy on the Steel Building was released.

The failure of the Internal Revenue Service to proceed against Harold is due principally to his poor financial condition at the time. His deteriorating marriage had finally resulted in a divorce and property settlement on November 29, 1965. Helen received all the stock in Columbia Warehouse, the Steel Building and the personal residence. Harold was left with his one-third interest in the Rhodes Building rentals—not an attractive asset to the Internal Revenue Service because it was already obligated to pay off mortgages on the Rhodes Building and Steel Building. Since Helen had filed joint returns with Harold for all the years involved, she was jointly and severally liable for the taxes, and the Internal Revenue Service levied on her property. [Internal Revenue Code of 1954, § 6013(d)(3).]

Helen's timely claims for refund of the taxes were denied by the Internal Revenue Service. Similarly, her claim against the forged check fund was denied by the Treasury Department. Her suit here does not challenge the disallowance of the business bad debt deductions and the associated net operating loss carrybacks. Rather, she relies on the Check Forgery Insurance Fund statute,

and alternatively, on the theory that the assessment and collection against her were improper because no refund was ever made to her.

In order for plaintiff to prevail on her claim under the Check Forgery Insurance Fund statute, she must meet each of its four parts.

██ Plaintiff cannot recover unless each of the checks was lost or stolen without her fault. There is no doubt that Harold changed the address on the application for tentative carryback adjustment, from their home address to his office address. However, the checks were all payable to them jointly. In view of this form of payment, Harold's receipt and possession of the checks was clearly lawful. The only question is whether he had complete authority and dominion over the funds represented by the checks. Local law—not Federal law—determines the ownership of refunds received with respect to income reported on a joint Federal tax return. See In re Carson, 83 N.J.Super. 287, 199 A.2d 407, 408 (1964).

Plaintiff argues that Harold's use of the funds was wrongful under the rule in Elwert v. Pacific First Federal Savings & Loan Assn., 138 F.Supp. 395 (D.C.Or.1956). However, in that case, the plaintiff was deemed to own an interest in the checks because they represented the sale proceeds of certain property she and her husband owned as tenants by the entireties. Therefore, each spouse had an undivided half interest in the money. To the contrary here, the checks were refunds of taxes on income that had been earned solely by Harold. The decision In re Illingworth, 51 A.F. T.R. 1512, 1513–14 (D.C.Or.1956, Referee's op.), demonstrates that in such a case the wife has no property interest in such funds.[2] The court plainly stated that:

The law, while providing certain benefits in the filing of a joint return and imposing certain liabilities, does

2. Oregon is not a community property state. O.R.S. § 108.520.

not go as far as to change the ownership of any property between the husband and wife. The filing of the joint return, therefore, did not vest in the wife, any title to any part of the tax refund.

\* \* \* \* \* \*

\* \* \* In this case, the wife had no earnings and no withholdings from wages for tax purposes, and hence has no ownership interest in any part of the refund.

■ Failure to establish this first prerequisite is sufficient in itself to deny plaintiff recovery under the Check Forgery Insurance Fund statute, but a commentary follows on the other requirements to be met before such relief is allowable.

■■ Since Helen had no property interest in the funds, it matters not whether Harold signed only his name, or also her name when he endorsed the checks. And, even if she did have a property interest, it is clear that he properly signed her name to the third check because it was deposited to their joint account at the First National Bank of Oregon. Furthermore, there was evidence that throughout their marriage, it was customary for Harold or Helen to endorse checks made out to the other, and neither objected. For example, Helen endorsed Harold's name on an Oregon state income tax refund check in 1963 and on several Veterans Administration checks payable to Harold, both before and after their divorce. Harold, in turn, signed Helen's name to their joint Federal income tax return for 1959 and to a promissory note during the period of their separation. Consequently, there may have been apparent or actual authority as to third persons for Harold to have endorsed Helen's name to the first two checks. No forgery occurred.

■ As to the third element—lack of Helen's participation in the funds—the evidence showed that Harold paid substantial amounts toward the support of Helen and their children after July 1963. For example, he made payments on three cars for six months and on the Steel Building mortgage until March 1966. When combined with the $5,300 Harold sent from Hawaii, these amounts alone ($32,421, see finding 21) exceed that portion of the first two checks ($25,391.15) which he took to Hawaii—the third check being no longer in issue since it was deposited into a joint account. Thus, Helen participated in the proceeds of the checks.

As to reclamation of the amounts from Harold, the court is satisfied that such an attempt would have been unsuccessful as he had few assets of value following his return from Hawaii, and he was adjudged a bankrupt on July 6, 1970.

■ Plaintiff's alternative claim—that at law no payment was ever made to her so that the money still remains in the United States Treasury—is without merit. In re Illingworth, *supra*, contains the following statement:

> The Government in making a tax refund makes no attempt to determine what part of such refund should belong to the husband and what part to the wife, but leaves it to the recipients to decide how such refund shall be divided or used. [51 A.F.T.R. at 1513–14.]

The Government is not responsible for seeing that monies refunded with respect to joint Federal tax returns are delivered to the individual spouse who earned the income. To require otherwise would overly burden proper administration of Federal tax laws. See Rev. Rul. 230, 1953–2 Cum.Bull. 85.

On the basis of the foregoing, it is concluded that plaintiff's petition should be dismissed. It follows that the Government is not entitled to judgment over, against either bank and that the banks' counterclaims against Harold P. Duden (who is not a party) should be dismissed.